OPINION EN BANC
BOUDIN, Circuit Judge.
The question for the en bane court is whether the attorney work product doctrine shields from an IRS summons “tax accrual work papers” prepared by lawyers and others in Textron’s Tax Department to support Textron’s calculation of tax reserves for its audited corporate financial statements. Textron is a major aerospace and defense conglomerate, with well over a hundred subsidiaries, whose consolidated tax return is audited by the IRS on a regular basis. To understand the dispute, some background is required concerning financial statements, contingent tax reserves and tax audit work papers.
As a publicly traded corporation, Tex-tron is required by federal securities law to have public financial statements certified by an independent auditor. See 15 U.S.C. §§ 78l, 78m (2006); 17 C.F.R. § 210 et seq. (2009). To prepare such financial statements, Textron must calculate reserves to be entered on the company books to account for contingent tax liabilities. Such liabilities, which affect the portrayal of assets and earnings, include estimates of potential liability if the IRS *23 decides to challenge debatable positions taken by the taxpayer in its return.
The calculation of such reserves entails preparing work papers describing Tex-tron’s potential liabilities for further taxes; these underpin the tax reserve entries in its financial statement and explain the figures chosen to the independent auditor who certifies that statement as correct. By examining the work papers the accountant discharges its own duty to determine “the adequacy and reasonableness of the corporation’s reserve account for contingent tax liabilities.” United States v. Arthur Young & Co., 465 U.S. 805, 812, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (rejecting claim of accountant work product privilege protecting such work papers).[1] The work papers are thus one step in a process whose outcome is a certified financial statement for the company.
In Textron’s case, its Tax Department lists items in the tax return that, if identified and challenged by the IRS, could result in additional taxes being assessed. The final spreadsheets list each debatable item, including in each instance the dollar amount subject to possible dispute and a percentage estimate of the IRS’ chances of success. Multiplying the amount by the percentage fixes the reserve entered on the books for that item. The spreadsheets reflecting these calculations may be supported by backup emails or notes.
A company’s published financial statements do not normally identify the specific tax items on the return that may be debatable but incorporate or reflect only the total reserve figure. As the Supreme Court explained in Arthur Young, tax accrual work papers provide a resource for the IRS, if the IRS can get access to them, by “pinpointing] the ‘soft spots’ on a corporation’s tax return by highlighting those areas in which the corporate taxpayer has taken a position that may, at some later date, require the payment of additional taxes” and providing “an item-by-item analysis of the corporation’s potential exposure to additional liability.” 465 U.S. at 813, 104 S.Ct. 1495.
The IRS does not automatically request tax accrual work papers from taxpayers; rather, in the wake of Enron and other corporate scandals, the IRS began to seek companies’ tax accrual work papers only where it concluded that the taxpayer had engaged in certain listed transactions “that [are] the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction.” 26 C.F.R. § 1.6011-4(b)(2) (2009). Only a limited number of transactions are so designated.[2]
The present case began with a 2003 IRS audit of Textron’s corporate income tax liability for the years 1998-2001. In reviewing Textron’s 2001 return, the IRS determined that a Textron subsidiary— Textron Financial Corp. (“Textron Financial”) — had engaged in nine listed transactions. In each of the nine instances, Tex-tron Financial had purchased equipment from a foreign utility or transit operator *24 and leased it back to the seller on the same day. Although such transactions can be legitimate, the IRS determined that they were sale-in, lease-out (“SILO”) transactions, which are listed as a potential tax shelter subject to abuse by taxpayers.
SILOs allow tax-exempt or tax-indifferent organizations — for example, a tax-exempt charity or a city-owned transit authority — to transfer depreciation and interest deductions, from which they cannot benefit, to other taxpayers who use them to shelter income from tax. Where the only motive of a sale and lease back is tax avoidance, it can be disregarded by the IRS and taxes assessed on the wrongly sheltered income.[3]
Textron had shown the spreadsheets to its outside accountant, Ernst & Young, but refused to show them to the IRS. The IRS issued an administrative summons pursuant to 26 U.S.C. § 7602 (2006), which allows the IRS, in determining the accuracy of any return, to “examine any books, papers, records, or other data which may be relevant or material to such inquiry.” Id. § 7602(a)(1). According to IRS policy, where the taxpayer claims benefits from only a single listed transaction, the IRS seeks only the workpapers for that transaction; but where (as in Textron’s case) the taxpayer claims benefits from multiple listed transactions, the IRS seeks all of the workpapers for the tax year in question. I.R.S. Announcement 2002-63, 2002-27 I.R.B. 72 (July 8, 2002). The summons also sought related work papers created by Ernst & Young in determining the adequacy of Textron’s reserves that Textron might possess or could obtain. Textron again refused.
The IRS brought an enforcement action in federal district court in Rhode Island. See 26 U.S.C. § 7604(a) (2006). Textron challenged the summons as lacking legitimate purpose and also asserted, as bars to the demand, the attorney-client and tax practitioner privileges and the qualified privilege available for litigation materials under the work product doctrine. The IRS contested all of the privilege claims. Both the IRS and Textron filed affidavits and, in addition, the district court heard witnesses from both sides.[4]
Textron agreed that it usually settled disputes with the IRS through negotiation or concession or at worst through the formal IRS administrative process; but it testified that sometimes it had litigated disputed tax issues in federal court. Its evidence also showed that the estimates for tax reserves and the supporting work papers were generated within its Tax Department but that tax lawyers in that department were centrally involved in their preparation and that Textron Financial also used an outside counsel to advise it on tax reserve requirements.
Textron described generically the contents of the work papers in question: *25 these included (1) summary spreadsheets showing for each disputable item the amount in controversy, estimated probability of a successful challenge by the IRS, and resulting reserve amounts; and (2) back up e-mail and notes. In some instances the spreadsheet entries estimated the probability of IRS success at 100 percent. Textron said that the spreadsheets had been shown to and discussed with its independent auditor but physically retained by Textron.
Neither side disputed that the immediate purpose of the work papers was to establish and support the tax reserve figures for the audited financial statements. Textron’s evidence was to the effect that litigation over specific items was always a possibility; the IRS did not deny that in certain cases litigation could result although it said that this was often unlikely. Whether Textron’s evidence is materially different than that of the IRS remains to be considered.
Ultimately, the district court denied the petition for enforcement. United States v. Textron Inc., 507 F.Supp.2d 138, 150, 155 (D.R.I.2007). The court agreed with the IRS that the agency had a legitimate purpose for seeking the work papers. Id. at 145. It also ruled that insofar as the Textron-prepared work papers might otherwise be protected by attorney-client privilege, or the counterpart tax practitioner privilege for non-lawyers engaged in tax practice, see 26 U.S.C. § 7525 (2006), those privileges had been waived when Textron disclosed the work papers’ content to Ernst & Young. Id. at 152.
However, the district court concluded that the papers were protected by the work product privilege, which derived from Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and is now embodied in Rule 26(b)(3) of the Federal Rules of Civil Procedure. This privilege, the district court held, had not been waived by disclosure of the work papers to the accountant. Textron, 507 F.Supp.2d at 152-53. The district court’s decision that the work papers were protected work product involved both a description of factual premises and a legal interpretation of applicable doctrine.
The district court first said (paraphrasing a Textron witness) the work papers were prepared to assure that Textron was “adequately reserved with respect to any potential disputes or litigation” over its returns; the court also said that, by fair inference, the work papers served “to satisfy an independent auditor that Textron’s reserve for contingent liabilities satisfied the requirements of generally accepted accounting principles (GAAP) so that a ‘clean’ opinion would be given” for Textron financial statements. Textron, 507 F.Supp.2d at 143.
Then, in its discussion of legal doctrine, the district court stated:
As the IRS correctly observes, the work product privilege does not apply to “ ‘documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.’ ” Maine, 298 F.3d at 70 (quoting [United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir.1998)]). However, it is clear - that the opinions of Textron’s counsel and accountants regarding items that might be challenged by the IRS, their estimated hazards of litigation percentages and their calculation of tax reserve amounts would not have been prepared at all “but for” the fact that Textron anticipated the possibility of litigation with the IRS .... Thus, while it may be accurate to say that the workpapers helped Textron determine what amount should be reserved to cover any potential tax liabilities and that *26 the workpapers were useful in obtaining a “clean” opinion from E & Y regarding the adequacy of the reserve amount, there would have been no need to create a reserve in the first place, if Textron had not anticipated a dispute with the IRS that was likely to result in litigation or some other adversarial proceeding.
Textron, 507 F.Supp.2d at 150.
The court concluded that the work papers were therefore prepared “because of’ the prospect of litigation, Textron, 507 F.Supp.2d at 150, a phrase used in Maine v. United States Dep’t of Interior, 298 F.3d 60, 68 (1st Cir.2002). The court rejected the IRS’ reliance on a Fifth Circuit decision rejecting work product protection for tax accrual work papers on the ground that the Fifth Circuit followed a different “primary purpose” test for work protect. Textron, 507 F.Supp.2d at 150 (discussing United States v. El Paso Co., 682 F.2d 530, 543 (5th Cir.1982), cert. denied, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984)).
On appeal, a divided panel upheld the district court’s decision. The en banc court then granted the government’s petition for rehearing en banc, vacated the panel decision, and obtained additional briefs from the parties and interested amici. We now conclude that under our own prior Maine precedent — which we reaffirm en banc — the Textron work papers were independently required by statutory and audit requirements and that the work product privilege does not apply.
The case presents two difficulties. One, which can readily be dispelled, stems from the mutability of language used in the governing rules and a confusion between issues of fact and issues of legal characterization. The other problem is more basic: how far work product protection extends turns on a balancing of policy concerns rather than application of abstract logic; here, two circuits have addressed tax accrual work papers in the work product context, but, apart from whatever light is east by Arthur Young, the Supreme Court has not ruled on the issue before us, namely, one in which a document is not in any way prepared “for” litigation but relates to a subject that might or might not occasion litigation.
In origin, the work product privilege derives from the Supreme Court’s decision in Hickman v. Taylor, 329 U.S. at 510-11, 67 S.Ct. 385, and focused at the outset on the materials that lawyers typically prepare for the purpose of litigating cases. Hickman v. Taylor concerned ongoing litigation in which one side filed interrogatories seeking from opposing counsel memoranda recording witness interviews that the latter had conducted after receiving notice of possible claims. Often such material and other items designed for use at trial (e.g., draft briefs, outlines of cross examination) are not obtained from or shared with clients and are unprotected by the traditional attorney-client privilege.
Hickman v. Taylor addressed “the extent to which a party may inquire into oral and written statements of witnesses, or other information, secured by an adverse party’s counsel in the course of preparation for possible litigation after a claim has arisen.” 329 U.S. at 497, 67 S.Ct. 385. The Court cited a privilege in English courts protecting
[a]ll documents which are called into existence for the purpose — but not necessarily the sole purpose — of assisting the deponent or his legal advisers in any actual or anticipated litigation .... Reports ... if made in the ordinary course of routine, are not privileged ....
Id. at 510 n. 9, 67 S.Ct. 385.
This history led the Court to practical considerations:
*27 Proper preparation of a client’s case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference .... This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways — aptly though roughly termed ... as the “work product of the lawyer.”
Id. at 511, 67 S.Ct. 385.
On this basis the Court declared that the interrogatories, which sought witness interviews conducted by opponent counsel in preparation for litigation, were protected by a qualified privilege. See id. at 511— 12, 67 S.Ct. 385. When in 1970 the Supreme Court through the rule-making process codified the work product privilege in Rule 26(b)(3), it described the privilege as extending to documents and other tangible things that “are prepared in anticipation of litigation or for trial.” This phrase, as illuminated by Hickman v. Taylor’s reasoning, is the one to be applied in this case.
Turning back to the present case, the IRS is unquestionably right that the immediate motive of Textron in preparing the tax accrual work papers was to fix the amount of the tax reserve on Textron’s books and to obtain a clean financial opinion from its auditor. And Textron may be correct that unless the IRS might dispute an item in the return, no reserve for that item might be necessary, so perhaps some of the items might be litigated. But in saying that Textron wanted to be “adequately reserved,” the district judge did not say that the work papers were prepared for use in possible litigation — only that the reserves would cover liabilities that might be determined in litigation. If the judge had made a “for use” finding— which he did not — that finding would have been clearly erroneous.
That the purpose of the work papers was to make book entries, prepare financial statements and obtain a clean audit cannot be disputed. This was the testimony of IRS expert and former Chief Auditor of the Public Company Accounting Oversight Board Douglas Carmichael:
Q. ... Would you please explain what tax accrual workpapers are?
A. ... Tax accrual workpapers really include all the support for the tax assets and liabilities shown in the financial statements ....
A. Well, from the company’s perspective, they’re created because, for example, for a public company, the key officers of the company sign a certification saying that those financial statements are fairly presented, and they need support for that.
From the auditor’s perspective, it’s the same thing, the auditor needs to record in the workpapers what the auditor did to comply with generally accepted auditing standards. So the workpapers are the principal support for the auditor’s opinion.
Q. And why do public companies prepare financial statements?
A. Usually, to meet requirements for raising capital. If they’re a public company, they need to file annual financial statements on a form 10K with the SEC and quarterly information on a 10Q.
The Textron witnesses, while using the word “litigation” as often as possible in their testimony, said the same thing. Tex-tron’s testimony differed from that of the IRS expert only in its further assertion that, without the possibility of litigation, no tax reserves or audit papers would have been necessary. For example, Roxanne *28 Cassidy, Textron’s director of tax reporting, testified as follows:
Q. ... [W]hat was Textron’s purpose in preparing those tax reserve papers?
A. The purpose primarily was to determine whether Textron was adequately reserved with respect to any potential disputes or litigations that would happen in the future. We would need to ensure that we were adequately reserved in the current year on Textron’s financial statements.
Q. And as a publicly traded company, is Textron required to file its financial statements with the Securities and Exchange Commission?
A. Yes.
Q. And do those financial statements include tax reserves?
A. Yes ....
Q. And in having its tax reserves audited by an independent auditor, must Textron be able to support the determinations it has made regarding the adequacy of its tax reserves with some type of evidence?
A. Yes, the support needs to be to the satisfaction of the auditors.
As the IRS expert stated, even if litigation were “remote,” the company would still have to prepare work papers to support its judgment. Textron’s own witness acknowledged that it would “have to include in its ... tax accrual work papers any new transactions that the company entered into that year that there might be some tax exposure on” regardless of whether it anticipated likely litigation. Judged by Textron’s own experience, most — certainly those with high percentage estimates of IRS success — would never be litigated.
To complete the story, we note one suggestion by one Textron witness that, if litigation did occur, the work papers could be useful to Textron in that litigation.[5] This assertion was not supported by any detailed explanation, was not adopted by the district judge and is more than dubious: the main aim of audit work papers is to estimate the amount potentially in dispute and the percentage chance of winning or losing. Even an academic supporter of Textron’s legal position conceded that “it is doubtful that tax accrual workpapers, which typically just identify and quantify vulnerable return positions, would be useful in the litigation anticipated with respect to those positions.” Pease-Wingenter, The Application of the Attorney-Client Privilege to Tax Accrual Workpapers: The Real Legacy of United States v. Tex-tron, 8 Houston Bus. & Tax L.J. 337, 346 (2008).
Any experienced litigator would describe the tax accrual work papers as tax documents and not as case preparation materials. Whether work product protection should apply to such documents is a legal question informed by the language of rules and Supreme Court doctrine, direct precedent, and policy judgments. The first of these sources — Supreme Court doctrine and the wording of the rules — is helpful to the IRS; direct circuit precedent and the underlying policy of the doctrine and other prudential considerations are more helpful still. Legal commentators can be found on *29 each side; the most persuasive of them favors the IRS.[6]
From the outset, the focus of work product protection has been on materials prepared for use in litigation, whether the litigation was underway or merely anticipated. Thus, Hickman v. Taylor addressed “the extent to which a party may inquire into oral and written statements of witnesses, or other information, secured by an adverse party’s counsel in the course of preparation for possible litigation after a claim has arisen.” 329 U.S. at 497, 67 5. Ct. 385 (emphasis added). Similarly, the English privilege, invoked by Hickman v. Taylor, privileged “documents which are called into existence for the purpose — but not necessarily the sole purpose — of assisting the deponent or his legal advisers in any actual or anticipated litigation.” Id. at 510 n. 9, 67 S.Ct. 385 (emphasis added) (internal quotation marks omitted).
The phrase used in the codified rule— “prepared in anticipation of litigation or for trial” did not, in the reference to anticipation, mean prepared for some purpose other than litigation: it meant only that the work might be done for litigation but in advance of its institution. The English precedent, doubtless the source of the language in Rule 26, specified the purpose “of
assisting the deponent or his legal advisers in any actual or anticipated litigation .... ” The Advisory Committee’s Note cited with approval a decision denying work product protection to a driver’s accident report, made pursuant to Interstate Commerce Commission rules, even though it might well have become the subject of litigation. Fed.R.Civ.P. 26 advisory committee’s note (1970).[7]
It is not enough to trigger work product protection that the subject matter of a document relates to a subject that might conceivably be litigated. Rather, as the Supreme Court explained, “the literal language of [Rule 26(b)(3) ] protects materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.” Federal Trade Commission v. Grolier Inc., 462 U.S. 19, 25, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (emphasis added). This distinction is well established in the case law. See, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 138, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).[8]
Nor is it enough that the materials were prepared by lawyers or represent legal thinking. Much corporate material prepared in law offices or reviewed by law *30 yers falls in that vast category. It is only work done in anticipation of or for trial that is protected. Even if prepared by lawyers and reflecting legal thinking, “[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision.” Fed.R.Civ.P. 26 advisory committee’s note (1970). Accord Hickman v. Taylor, 329 U.S. at 510 n. 9, 67 S.Ct. 385 (quoting English precedent that “[r]eports ... if made in the ordinary course of routine, are not privileged”).
Every lawyer who tries cases knows the touch and feel of materials prepared for a current or possible (ie., “in anticipation of’) law suit. They are the very materials catalogued in Hickman v. Taylor and the English precedent with which the decision began. No one with experience of law suits would talk about tax accrual work papers in those terms. A set of tax reserve figures, calculated for purposes of accurately stating a company’s financial figures, has in ordinary parlance only that purpose: to support a financial statement and the independent audit of it.
Focusing next on direct precedent, work product protection for tax audit work papers has been squarely addressed only in two circuits: this one and the Fifth. In Maine, we said that work product protection does not extend to “documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation.” Maine, 298 F.3d at 70 (quoting United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir.1998)) (internal quotation marks omitted). Maine applies straightforwardly to Textron’s tax audit work papers — which were prepared in the ordinary course of business — and it supports the IRS position.
Similarly, the Fifth Circuit in El Paso denied protection for the work papers because the court recognized that the company in question was conducting the relevant analysis because of a need to “bring its financial books into conformity with generally accepted auditing principles.” 682 F.2d at 543. The Fifth Circuit, which employs a “primary purpose” test, found that the work papers’ “sole function” was to back up financial statements. Id. at 543-44. Here, too, the only purpose of Textron’s papers was to prepare financial statements.
Other circuits have not passed on tax audit work papers and some might take a different view. But many of the debatable cases affording work product protection involve documents unquestionably prepared for potential use in litigation if and when it should arise.[9] There is no evidence in this case that the work papers were prepared for such a use or would in fact serve any useful purpose for Textron in conducting litigation if it arose.
Finally, the underlying prudential considerations squarely support the IRS’ position in this case, and such considerations have special force because Hickman v. Taylor was the child of such considerations, as the quotations above make clear. The privilege aimed centrally at protecting the litigation process, Coastal States Gas Corp. v. Department of Energy, 617 F.2d 854, 864 (D.C.Cir.1980), specifically, work done by counsel to help him or her in *31 litigating a case. It is not a privilege designed to help the lawyer prepare corporate documents or other materials prepared in the ordinary course of business. Where the rationale for a rule stops, so ordinarily does the rule.
Nor is there present here the concern that Hickman v. Taylor stressed about discouraging sound preparation for a law suit. That danger may exist in other kinds of cases, but it cannot be present where, as here, there is in substance a legal obligation to prepare such papers: the tax audit work papers not only have a different purpose but have to be prepared by exchange-listed companies to comply with the securities laws and accounting principles for certified financial statements. Arthur Young made this point in refusing to create an accountant’s work product privilege for tax audit papers:
[T]he auditor is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation’s contingent tax liabilities have been accurately stated____Responsible corporate management would not risk a qualified evaluation of a corporate taxpayer’s financial posture to afford cover for questionable positions reflected in a prior tax return.
465 U.S. at 818-19, 104 S.Ct. 1495; see also Johnson, supra, at 160-61.
Textron apparently thinks it is “unfair” for the government to have access to its spreadsheets, but tax collection is not a game. Underpaying taxes threatens the essential public interest in revenue collection. If a blueprint to Textron’s possible improper deductions can be found in Tex-tron’s files, it is properly available to the government unless privileged. Virtually all discovery against a party aims at securing information that may assist an opponent in uncovering the truth. Unprivileged IRS information is equally subject to discovery.[10]
The practical problems confronting the IRS in discovering under-reporting of corporate taxes, which is likely endemic, are serious. Textron’s return is massive — constituting more than 4,000 pages — and the IRS requested the work papers only after finding a specific type of transaction that had been shown to be abused by taxpayers. It is because the collection of revenues is essential to government that administrative discovery, along with many other comparatively unusual tools, are furnished to the IRS.
As Bentham explained, all privileges limit access to the truth in aid of other objectives, 8 Wigmore, Evidence § 2291 (McNaughton Rev. 1961), but virtually all privileges are restricted — either (as here) by definition or (in many cases) through explicit exceptions — by countervailing limitations. The Fifth Amendment privilege against - self-incrimination is qualified, among other doctrines, by the required records exception, see Grosso v. United States, 390 U.S. 62, 67-68, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and the attorney client privilege, along with other limitations, by the crime-fraud exception, see Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 77 L.Ed. 993 (1933).
To sum up, the work product privilege is aimed at protecting work done for litigation, not in preparing financial statements. Textron’s work papers were prepared to support financial filings and gain auditor approval; the compulsion of the securities laws and auditing requirements assure that they will be carefully prepared, in *32 their present form, even though not protected; and IRS access serves the legitimate, and important, function of detecting and disallowing abusive tax shelters.
The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this decision. It is so ordered.

Dissent follows.

. The procedural requirement that auditors examine tax accrual work papers is based on a combination of Statement on Auditing Standards No. 96, Audit Documentation (2002), superseded by Auditing Standards No. 3, Audit Documentation (2004); Statement on Auditing Standards No. 326, Evidential Matter (1980); and Auditing Interpretation No. 9326, Evidential Matter: Auditing Interpretations of Section 326 (2003).

. A current list of such transaction types, amounting to less than three dozen, appears at Internal Revenue Service, Recognized Abusive and Listed Transactions — LMSB Tier I Issues, http://www.irs.gov/businesses/ corporations/article/0,id= 120633,00.html (visited July 7, 2009).

. See AWG Leasing Trust v. United States, 592 F.Supp.2d 953, 958 (N.D.Ohio 2008) (upholding denial of depreciation and interest deductions for SILO transaction); I.R.S. Notice 2005-13, 2005-9 I.R.B. 630 (Feb. 11, 2005); Shvedov, Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities 10-12, CRS Report for Congress (Nov. 30, 2004).

. Textron’s evidence came from Norman Richter, chief tax counsel and manager of Textron's Tax Department; Roxanne Cassidy, director of tax reporting; Edward Andrews, director of tax audits; Debra Raymond, vice president, taxes, of Textron Financial; and Mark Weston, a partner in Ernst & Young. IRS evidence was provided by Internal Revenue Agent Edward Vasconcellos; Professor Douglas Carmichael, former chief auditor of the regulatory body for auditors of public companies (the Public Company Accounting Oversight Board); and Gary Kane, an IRS expert on tax accrual work papers.

. Textron Vice President of Taxes Norman Richter said that Textron would still prepare tax accrual workpapers absent GAAP requirements "[b]ecause it guides us — it’s—the analysis is still — it would guide us in making litigation and settlement decisions later in the process.” This assertion was not contained in Richter's affidavit, which instead said that Textron prepared the work papers “to comply with GAAP” as required for reporting taxes to the SEC, and was not supported by detail or explanation in the record.

. See Ventry, Protecting Abusive Tax Avoidance, 120 Tax Notes 857, 870-83 (2008); Johnson, The Work Product Doctrine and Tax Accrual Workpapers, 124 Tax Notes 155, 160-68 (2009). The Pease-Wingenter article, supra, identifies many weaknesses in the Textron argument, id. at 343-48, although Pease now says her own ultimate view favors Tex-tron.

. Goosman v. A. Duie Pyle, Inc., 320 F.2d 45 (4th Cir.1963). In Goosman, the Fourth Circuit denied work product protection to reports a truck driver made to the lessee and owner of the truck following an accident. The court explained that the reports "were made in the ordinary course of business under ICC regulations and do not represent the lawyer's work product within the holding in Hickman v. Taylor." Id. at 52. See also, e.g., Calabro v. Stone, 225 F.R.D. 96, 99 (E.D.N.Y. 2004); In re Raytheon Securities Litigation, 218 F.R.D. 354, 359 (D.Mass.2003).

. Accord United States v. Roxworthy, 457 F.3d 590, 595 (6th Cir.2006) ("Nevertheless, the key issue in determining whether a document should be withheld is the function that the document serves.”); Coastal States Gas Corp. v. Dep’t of Energy, 617 F.2d 854, 858 (D.C.Cir. 1980) (same); Church of Scientology Int’l v. IRS, 845 F.Supp. 714, 723 (C.D.Cal.1993) ("The Ninth Circuit test focuses on the function of a document as part of the deliberative process rather than on the contents of the document.”).

. See, e.g., Delaney, Migdail & Young, Chartered v. IRS, 826 F.2d 124, 127 (D.C.Cir.1987) (protection for "attorneys’ assessment of ... legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case”); see also In re Sealed Case, 146 F.3d 881, 885 (D.C.Cir.1998) (protection for documents to "protect the client from future litigation about a particular transaction”).

. See Abel Inv. Co. v. United States, 53 F.R.D. 485, 488 (D.Neb.1971) (holding that IRS documents created during an audit were not protected work product, despite containing attorneys’ mental impression and legal theories, because an IRS audit is not litigation).