SALEM FINANCIAL, INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 10–192T.

United States Court of Federal Claims.

Jan. 18, 2012.

Rajiv Madan, with whom were Christopher Bowers, John Magee, Deana El–Mallawany, James C. McGrath, Christopher Murphy, and Nathan Wacker, Bingham McCutchen LLP, Washington, DC, for Plaintiff.

Dennis M. Donohue, with whom were John A. DiCicco, Principal Deputy Assistant Attorney General, Raagnee Beri, William E. Farrior, Gregory L. Jones, Alan S. Kline, Kari M. Larson, and John L. Schoenecker, Tax Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER ON DEFENDANT'S MOTION TO COMPEL DISCOVERY

WHEELER, Judge.

### Background

This case involves the determination of the appropriate tax treatment of a complex transaction known as STARS ("Structured Trust Advantaged Repackaged Securities"). By means of the STARS transaction, Plaintiff's predecessor-in-interest, Branch Investments LLC ("Branch") was able to claim foreign income tax credits on its 2002–2007 U.S. tax returns totaling $498,161,951; business expense deductions on its 2002–2007 tax returns; and interest expense deductions on its 2006–2007 U.S. tax returns. *See* Compl. ¶¶ 31, 34–35, March 30, 2010. During the 2002–2007 taxable years, Branch was a partially-owned subsidiary of Branch Banking and Trust Company, which was a wholly-owned subsidiary of BB & T Corporation ("BB & T"). *Id.* ¶¶ 7, 11. Branch ceased utilizing STARS in April 2007. *See id.* ¶ 27.

On February 12, 2010, the Internal Revenue Service ("IRS") issued a Notice of Deficiency regarding Branch's tax reporting on

its 2002–2007 U.S. tax returns and asserted penalties for the alleged underpayment of taxes during that time period. *Id.* ¶¶ 41–42. Plaintiff subsequently executed a Notice of Deficiency Waiver consenting to the immediate assessment and collection of taxes while reserving its right to seek a refund. *Id.* ¶¶ 43–44. On March 1, 2010, the IRS assessed taxes, penalties, and deficiency interest resulting from adjustments for the 2002–2007 tax years, totaling $884,735,418.49, which amount Plaintiff paid in full that same day. *Id.* ¶ 47. After the IRS denied Plaintiff's claim for a tax refund, *see id.* ¶¶ 48–49, Plaintiff filed its complaint in this Court on March 30, 2010, seeking recovery of $688,110,924.80 in federal income taxes and penalties for the taxable years 2002–2007, as well as deficiency interest collected from Plaintiff and overpayment interest on the refund requested. *Id.* ¶ 1.

The parties initiated discovery in the fall of 2010 and are scheduled to complete fact discovery by April 2, 2012. *See* Scheduling Order, Sept. 15, 2011, Dkt. No. 44. On November 29, 2011, the Government filed a motion asserting that certain of Plaintiff's privilege claims are improper and seeking to compel Plaintiff to produce documents in the following categories: (A) those containing tax reserve information; (B) those withheld under the tax practitioner privilege; and (C) those withheld under the attorney-client privilege. *See* (Def.'s Mot. 5, 15, 22). The Government alleges that the attorney-client privilege does not protect the documents within the third category because the documents contain: (1) non-legal advice; (2) purely legal advice; or (3) advice from a person acting in a non-legal capacity. *See* Transcript of Oral Argument ("Tr.") 30, 37 (Donohue), Jan. 4, 2012; (Def.'s Mot. Ex. 15). Plaintiff filed its response to the Government's motion on December 19, 2011 ("Pl.'s Resp."), and the Government filed its reply on December 29, 2011 ("Def.'s Repl."). The Court heard oral argument on these discovery issues on January 4,

2012 at the National Courts Building in Washington, DC.

*Discussion*

## A. Documents Containing Tax Reserve Information

The first category of documents that the Government seeks to compel are Plaintiff's tax reserve documents. Plaintiff has redacted and withheld documents containing STARS-specific tax reserve information,[1] including its tax reserve estimates and other "[t]ax reserve information reflecting BB & T's analysis of the potential outcomes of litigation." (Pl.'s Resp. 8); (Def.'s Mot. Exs. 5–6.) Plaintiff claims that it is entitled to withhold these documents because they were prepared "in anticipation of litigation" and are thereby protected by the work product doctrine. (Pl.'s Resp. 8, 23.) By contrast, the Government maintains that tax reserves are prepared for financial reporting purposes—not in anticipation of litigation—and therefore, the tax reserves and associated workpapers are not protected by the work product doctrine. (Def.'s Mot. 5–6.)

In the alternative, the Government contends that Plaintiff waived any work product protection that may have applied to the tax reserve documents by relying on advice from its outside financial auditor, PricewaterhouseCoopers ("PwC"), concerning the reserves as a defense to IRS penalties, and by allowing PwC employees to testify as to the reasonableness of BB & T's tax reserves. *Id.* at 13–14. Plaintiff admits that it has put PwC's advice "at issue" in this case but contends that its tax reserves are "based on information and analysis independent of PwC's advice" and do "not relate to the same subject matter as PwC's technical analysis of STARS." (Pl.'s Resp. 6, 36.) As such, Plaintiff maintains that it did not waive work product protection over its tax reserve documents by relying on PwC's advice as part of its penalty defense. *Id.*

---

1. When preparing financial statements, public companies must calculate "tax reserves," reflecting the estimated value of contingent tax liabilities, such as losses resulting from the IRS disallowing certain tax reporting positions. *See United States v. Textron Inc.*, 577 F.3d 21, 37

(1st Cir.2009) (Torruella, J., dissenting); Michael M. Lloyd, Mark T. Gossart, and Garrett A. Fenton, *Understanding Tax Reserves and the Situations in Which They Arise*, Tax Notes, July 6, 2009; (Pl.'s Resp. 23); (Def.'s Mot. 5).

It is an unsettled question whether tax reserves and associated workpapers are prepared in anticipation of litigation, such that they constitute protected work product. *See, e.g., United States v. Textron Inc.,* 577 F.3d 21, 31–32 (1st Cir.2009) (holding that Textron's tax work papers were not protected by the work product doctrine); *but see, e.g., Regions Fin. Corp. & Subsidiaries v. United States,* 2008 WL 2139008, at *6–7, 2008 U.S. Dist. LEXIS 41940, at *23–25 (N.D.Ala.2008) (holding that Regions' tax accrual work papers were protected by the work product doctrine). The Federal Circuit has not ruled directly on the issue, and there is no controlling Supreme Court precedent.[2] The Court is sympathetic to the public policy considerations counseling toward application of the work product doctrine to tax reserve documents. *See Textron,* 577 F.3d at 34–39 (Torruella, J., dissenting). Nevertheless, the Court need not decide whether tax reserve documents are protected work product because the Court finds that Plaintiff has waived any such protection by relying on PwC's advice as a defense to IRS penalties.

■ Work product protection may be waived, and the party invoking the privilege must prove that it has not waived the protection. *Eden Isle Marina, Inc. v. United States,* 89 Fed.Cl. 480, 503 (2009) (citing *Evergreen Trading, LLC v. United States,* 80 Fed.Cl. 122, 127 (2007)). Waiver occurs when a party discloses material " 'in a way inconsistent with keeping it from the adversary,' " *Evergreen,* 80 Fed.Cl. at 133 (quoting *United States v. Mass. Inst. of Tech.,* 129 F.3d 681, 687 (1st Cir.1997)), such as using material as a basis for an affirmative defense, *id.* at 130.

■ When a party waives work product protection, the waiver extends to all nonopinion work product concerning the same subject matter. *In re EchoStar Comms. Corp.,*

448 F.3d 1294, 1302 (Fed.Cir.2006). In this way, "a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Fort James Corp. v. Solo Cup Co.,* 412 F.3d 1340, 1349 (Fed.Cir.2005) (internal citation omitted). While "[t]here is no bright line test" to determine what falls within the subject matter of a waiver, *id.* at 1349, the "overarching goal" of subject matter waiver is "to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice," *In re EchoStar,* 448 F.3d at 1303 (internal citations omitted). Balancing the competing interests, subject matter waiver seeks to ensure fundamental fairness. *See Eden Isle Marina,* 89 Fed.Cl. at 503–05.

■ As part of its defense to IRS penalties, Plaintiff contends it had reasonable cause for its tax reporting of the STARS transaction based upon "the extensive KPMG and Sidley tax opinions, PwC's conclusion that reliance on these opinions was reasonable, and [BB & T's] own internal review and approval of the proposed transaction." (Pl.'s Resp. 6); *see also* (Def.'s Mot. Ex. 11 at 8). By relying on PwC's advice as part of its defense to IRS penalties, Plaintiff concedes that it has put "the advisor's advice 'at issue' in this case." (Pl.'s Resp. 6.) Plaintiff attempts to distinguish, however, between PwC's "technical analysis of STARS" and the information and analysis that resulted in BB & T's tax reserve position, conceding waiver as to the former but not as to the latter. *Id.* at 36. Specifically, Plaintiff states: "Because Plaintiff's tax reserve information is based on information and analysis independent of PwC's advice and therefore does not relate to the same subject matter as PwC's technical analysis of STARS, no such waiver has occurred." *Id.*

2. In *United States v. Arthur Young & Co.,* 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984), the Supreme Court declined to create an accountant-client privilege protecting tax accrual workpapers " 'absent unambiguous directions from Congress.' " *Id.* at 816, 104 S.Ct. 1495 (quoting *United States v. Bisceglia,* 420 U.S. 141, 150, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975)). In so doing, the Court emphasized that the relevant statutory provisions at the time reflected a "congressional policy choice *in favor of disclosure*." *Id.* at 816, 104 S.Ct. 1495. As discussed more fully below, congressional policy changed in 1998 when Congress enacted legislation creating a tax practitioner privilege. *See* 26 U.S.C. § 7525 (2006). In light of this change, the Court concludes that the Supreme Court's rationale in *Arthur Young* is not controlling.

Yet, Plaintiff's own statements belie its position that the tax reserve analysis was "independent of" PwC's advice and technical analysis of STARS. Plaintiff admits that its reserve position was "informed by *advice of counsel* and Plaintiff's own analysis relating to the strengths and weaknesses of the *technical legal merits of the transaction.*" *Id.* at 23 (emphasis added). Elsewhere, Plaintiff concedes that "part of this reserve setting process was based on the review of *the technical merits of the transaction by PwC's technical tax experts.*" *Id.* (emphasis added). Plaintiff emphasizes that BB & T's reserve amount was based on "more than just the technical analysis," such as "the amount BB & T ... would be willing to give up in a settlement and how strenuously the company would defend the transaction if challenged." *Id.* at 24. However, the fact that BB & T considered other factors in determining its tax reserve position does not negate the fact that BB & T also considered PwC's technical analysis as part of that process. Subject matter waiver precludes Plaintiff from using PwC's favorable advice as a defense to penalties while simultaneously shielding potentially unfavorable advice that appears to have influenced BB & T's tax reserve position.

Furthermore, in the Court's view, the subject matters Plaintiff attempts to parse out are inextricably intertwined: in all likelihood, PwC's technical evaluation of the strengths and weaknesses of the STARS transaction influenced BB & T's analysis of its litigation and settlement positions. In this way, PwC's technical evaluation of STARS cannot be isolated as a separate subject matter but instead, is likely to infuse the entirety of BB & T's tax reserve analysis and position. In light of the above, the Court finds that Plaintiff waived any work product protection that may have applied to its tax reserve documents by relying on PwC's advice as a defense to IRS penalties.

---

**3.** Defendant represented in its reply, *see* (Def.'s Repl. 16), and counsel for Plaintiff confirmed at oral argument, Tr. 56 (McGrath), that of the ten documents Plaintiff initially withheld under the tax practitioner privilege, only five remain in dispute. Based upon the parties' filings, however, the Court has identified six documents that remain at issue: BBTW0002, BBTW0234,

## B. Documents Withheld Under the Tax Practitioner Privilege

The Government next seeks to compel six documents [3] that Plaintiff claims are protected by the statutory privilege afforded to federal tax practitioners under 26 U.S.C. § 7525. *See* (Def.'s Repl. 16); (Def.'s Mot. Ex. 15). According to Plaintiff, the challenged documents contain legal advice from KPMG after the close of the STARS transaction regarding proposed changes in law and the unwinding of STARS. (Pl.'s Resp. 15.) The Government contends that the documents fall within the exception to the privilege, which excludes from protection communications in connection with the "promotion" of a "tax shelter." (Def.'s Repl. 16–19); 26 U.S.C. § 7525(b)(2). In the alternative, the Government maintains that Plaintiff waived the privilege as to the documents at issue by relying on KPMG's advice as a defense to IRS penalties. (Def.'s Mot. 21.)

For its part, Plaintiff denies that STARS is a "tax shelter," as defined by 26 U.S.C. § 6662(d)(2)(C)(ii), or that any of the communications withheld under the tax practitioner privilege were made in connection with the "promotion" of a tax shelter. (Pl.'s Resp. 16, 19.) Accordingly, Plaintiff contends that the communications at issue do not fall within the exception to the tax practitioner privilege. *Id.* at 16. In addition, Plaintiff distinguishes between KPMG's advice rendered at the outset of the STARS transaction, on which it is relying as a defense to IRS penalties, and KPMG's advice rendered years later concerning proposed changes in law and the unwinding of STARS. *Id.* at 20–21. Plaintiff maintains that any waiver as to the former advice does not extend to the latter, which constitutes a separate subject matter. *Id.*

■ Through the enactment of the "Internal Revenue Service Restructuring and Re-

---

BBTW0237, BBTW0238, BBTW0627, and BBTW0629. *See* (Def.'s Repl. 16); (Pl.'s Resp. 15); (Def.'s Mot. Ex. 6). The Court's analysis concerning the applicability of the tax practitioner privilege pertains to these six documents only insofar as they continue to be in dispute between the parties.

form Act of 1998," Congress created the following tax practitioner privilege:

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

26 U.S.C. § 7525. The tax practitioner privilege may be asserted in "any noncriminal tax proceeding in Federal court brought by or against the United States." § 7525(a)(2). A federally authorized tax practitioner includes "accountants and enrolled agents authorized to practice before the IRS." *Evergreen*, 80 Fed.Cl. at 134. When Congress created the tax practitioner privilege, it also created an exception to that privilege, exempting from protection written communications "in connection with the promotion of the direct or indirect participation of the person in any tax shelter." § 7525(b)(2).

As noted above, the parties disagree on whether the communications at issue—all of which were made after the STARS transaction was executed, *see* (Pl.'s Resp. 16)—are in connection with the "promotion" of a tax shelter. Plaintiff takes the view that promotion should be read to encompass only marketing or soliciting activities, so that any promotion of STARS by KPMG ceased once BB & T entered into the transaction in 2002. *Id.* at 17. By contrast, the Government defines promotion as "furtherance" or "encouragement" of participation in a tax shelter, (Def.'s Mot. 18), and contends that "[t]he only question is whether the communication was 'in connection with the promotion,' not when it occurred," (Def.'s Repl. 18). Accordingly, Defendant maintains that KPMG's post-implementation assistance throughout the duration of STARS constitutes "promotion" of a tax shelter and thereby falls within the exception to the tax practitioner privilege. (Def.'s Repl. 19.)

■ In the Court's view, the Government seeks to broaden the scope of the exception to the tax practitioner privilege beyond its plain meaning. Congress chose to exempt from protection communications in connection with the "promotion" of participation in a tax shelter; it did not choose to exempt *communications in connection with the promotion and implementation* of a tax shelter, as the Government seeks to do. Once BB & T entered into the STARS transaction, KPMG no longer needed to promote BB & T's participation: BB & T was already participating. Accordingly, the Court finds that KPMG communications following the closing of the STARS transaction in 2002 do not constitute "promotion" and consequently, do not fall within the exception to the tax practitioner privilege.

■ Nevertheless, insofar as the documents at issue contain KPMG's advice concerning proposed changes in law and the unwinding of STARS, the Court finds that Plaintiff waived the privilege by relying on KPMG's advice as a defense to IRS penalties. This Court has observed that because the tax practitioner privilege is "largely coterminous with the attorney-client privilege," waiver of the tax practitioner privilege occurs on the same terms as waiver of the attorney-client privilege. *Evergreen*, 80 Fed.Cl. at 135. Thus, like attorney-client privilege, where a party waives the tax practitioner privilege as to a particular communication, it also waives the privilege as to all communications involving the same subject matter. *See id.* at 129.

In responding to interrogatories, Plaintiff indicated that it intends to support its defense to tax penalties, in part, by relying on advice it received from KPMG. *See* (Def.'s Mot. Ex. 11 at 4). Specifically, Plaintiff notes that as part of its efforts to determine the proper tax treatment of STARS, it obtained advice from KPMG, including a formal tax opinion providing a "should" level of comfort regarding Plaintiff's tax treatment of STARS. *Id.* at 4–5. Plaintiff maintains, however, that this pre-closing advice relates to a subject matter distinct from KPMG's post-closing advice regarding proposed changes in law and the unwinding of STARS. (Pl.'s Resp. 15.) As such, Plaintiff maintains that it has not waived the tax practitioner

privilege as to documents containing KPMG's post-closing advice. *Id.* at 21–22.

The Court is not persuaded. As with its tax reserve documents, the Court finds that Plaintiff is attempting to disclose only advice favorable to its position while concurrently shielding advice concerning the same subject matter that may be unfavorable to its position. In the Court's view, KPMG's pre- and post-closing advice appears to relate to the same subject matter: the proper tax treatment of STARS. It seems Plaintiff intends to use as a defense documents containing KPMG's pre-closing assessment of BB & T's tax treatment of STARS. If so, Plaintiff should not be able to withhold documents from KPMG potentially questioning that earlier assessment. In other words, Plaintiff cannot selectively disclose KPMG advice encouraging BB & T to utilize the STARS transaction while withholding advice counseling BB & T to cease utilizing it.

In addition, the parties disagree on BB & T's motivation for entering into the STARS transaction. Plaintiff contends that BB & T entered into the STARS transaction to obtain low-cost financing, *see* (Pl.'s Resp. 3), while the Government claims that BB & T did so to generate foreign income tax credits, *see* (Def.'s Mot. 2). The Government alleges that Plaintiff terminated the STARS transaction in response to the IRS's issuance of regulations disallowing foreign income tax credits from transactions such as STARS. Tr. 31 (Donohue). Insofar as Plaintiff intends to use as a defense KPMG documents showing that it entered into the STARS transaction to obtain low-cost financing, Plaintiff has waived privilege over later KPMG documents regarding proposed changes in law or the unwinding of STARS that may confirm or contradict its position.

## C. Documents Withheld Under the Attorney–Client Privilege

The final category of documents that the Government seeks to compel are those that Plaintiff claims are protected by the attorney-client privilege. The Government divides this category into three sub-categories, claiming that the documents are not privileged because they contain: (1) non-legal ad-

vice; (2) purely legal advice; or (3) advice from a person acting in a non-legal capacity. *See* Tr. 30, 37 (Donohue). The Court will address each sub-category in turn.

### 1. Documents allegedly containing non-legal advice

The Government seeks to compel a total of 410 documents that Plaintiff has withheld under the attorney-client privilege. *See* Tr. 30 (Donohue). Of the 410 documents, the Government seeks to compel 380 to 390 on the grounds that they are not privileged because they contain non-legal advice related to a tax transaction BB & T entered into in 2007 called the KNIGHT transaction. *See id.*; (Def.'s Mot. 27–28). For its part, Plaintiff maintains that these documents, provided by outside counsel regarding the KNIGHT transaction, "reflect legal advice." Tr. 64–65 (McGrath); *see also* (Pl.'s Resp. 10) (asserting that "the documents with respect to which Plaintiff claims attorney-client privilege relate to the provision of legal advice in all instances").

■ The Court is satisfied that communications related to the KNIGHT transaction may be relevant to the parties' claims and defenses to the extent they deal with the unwinding of STARS and the disposal of STARS assets. *See* Tr. 32–35 (Donohue) (representing that Plaintiff used the STARS assets as part of the KNIGHT transaction). Nevertheless, insofar as the communications regarding the KNIGHT transaction do not fall within the subject matters described in Parts A and B above, Plaintiff has not waived attorney-client privilege as to those communications. *See* (Pl.'s Resp. 5). For the attorney-client privilege to attach to the communications, however, they must be made for the purpose of obtaining *legal* advice. *Am. Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed.Cir.1987) (emphasis added) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). Where that is not the case, the communications are not protected.

■ As noted, the parties maintain diametrically opposite views as to whether the documents at issue contain legal advice. During oral argument on January 4, 2012,

counsel for Defendant suggested that the parties' dispute over the documents withheld under the attorney-client privilege could be resolved by using a "quick peek" procedure. Tr. 29 (Donohue). The Advisory Committee Notes accompanying Federal Rule of Civil Procedure 26 note that parties to a dispute may utilize a quick peek procedure to minimize the costs and delays associated with reviewing large amounts of documents to ensure that privileged communications are not disclosed inadvertently. Fed. R. Civ. Proc. 26(b)(2), advisory committee's note, 2006 amendments. Although the context here is different, the Court finds that something akin to a quick peek procedure would be useful to resolve the parties' dispute, especially given the large number of challenged documents. During oral argument, counsel for Plaintiff stated that he would be amenable to using a quick peek procedure. *See* Tr. 66–67 (Madan).

Accordingly, the Court directs counsel for the parties to meet in person at a mutually convenient time and place so that the Government may review the approximately 390 documents at issue. The Court anticipates that counsel for the Government will have an opportunity to review each document and designate those that it wishes Plaintiff to produce and those that it no longer seeks to compel. In providing the documents for the Government's review, Plaintiff does not waive any privilege or protection it has asserted previously in this case. Counsel for the parties may engage in discussions to attempt to reach agreement on disclosure or non-disclosure of the documents. If counsel desire to modify the above procedure in any respect, the Court is willing to consider reasonable alternative suggestions from the parties.

### 2. Documents allegedly containing purely legal advice

The Government seeks to compel an additional sub-category of documents on the basis that they are not privileged because they contain purely legal advice and do not reveal confidential client communications. *See* (Def.'s Mot. 25–27); Tr. 27–30 (Donohue). By contrast, Plaintiff maintains that the documents are "not something that you would

put in the category of pure legal advice." Tr. 64 (McGrath).

■ The Federal Circuit has explained that the attorney-client privilege does not protect all communications from an attorney to a client, although it protects some. *See Stovall v. United States*, 85 Fed.Cl. 810, 814–15 (2009) (citing *Am. Standard, Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745 (Fed.Cir. 1987)) (contrasting the Federal Circuit with the Fourth, Ninth, and Tenth Circuits, which have held that *all* advice provided by counsel to a client is privileged). The privilege applies only to communications from an attorney to a client that "reveal, directly or indirectly, the substance of a confidential communication by the client." *Am. Standard*, 828 F.2d at 745 (internal citation omitted). To illustrate, while an unsolicited legal memorandum from an attorney to members of a trade association may be an example of purely legal advice not protected by the privilege, legal advice in response to a client's request would be privileged.

Given the parties' divergent views on whether these communications contain purely legal advice or protected client communications, the Court finds that a quick peek procedure would be useful for these documents as well. Counsel for both parties indicated at oral argument that they would be amenable to using a quick peek procedure to resolve their dispute as to these documents. *See* Tr. 28–30 (Donohue); 66–67 (Madan). Accordingly, the parties shall use the same procedure outlined above in Part C(1) of this order to resolve their dispute over the documents that allegedly contain purely legal advice.

### 3. Documents allegedly containing advice from an individual acting in a non-legal capacity

Finally, the Government seeks to compel six documents that it alleges were prepared by an individual acting in a non-legal capacity. *See* Tr. 37–39 (Donohue). Specifically, the Government maintains that David Brockway was involved in developing and marketing the STARS transaction when he worked at KPMG. *Id.* at 38–39. According to the Government, Mr. Brockway then moved to the law firm of McKee Nelson, where he

made the challenged communications regarding the STARS transaction. *Id.* In the Government's view, while at McKee Nelson, Mr. Brockway was still providing advice as a promoter of the STARS transaction rather than as a legal adviser. *Id.* at 39. Plaintiff, on the other hand, maintains that when Mr. Brockway made the challenged communications, he was serving as legal counsel to BB & T. *See* Tr. 61 (McGrath).

 For the attorney-client privilege to attach to a communication, Plaintiff must show that the communication at issue was made by someone in his or her professional legal capacity. *In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984). The Court is satisfied by Plaintiff's representations that Mr. Brockway was serving as a legal adviser to BB & T and was providing legal advice to BB & T regarding the unwinding of STARS. *See* Tr. 61 (McGrath). Moreover, Plaintiff does not appear to rely on advice from McKee Nelson as a defense in this case. Accordingly, the Court finds that the privilege attaches to the communications from Mr. Brockway and that Plaintiff has not waived the privilege with respect to those communications.

### Conclusion

For the reasons set forth above, Defendant's motion to compel is GRANTED IN PART and DENIED IN PART. Counsel for Plaintiff shall promptly produce to Defendant all documents described in Parts A and B of this order. In addition, within 30 days of the date of this order, counsel for the parties shall convene to carry out the quick peek procedure discussed above in Parts C(1) and C(2) of this order. The Court will hold a telephonic status conference with the parties on February 22, 2012 at 10:00 AM (EST) to discuss any outstanding discovery issues related to this opinion and order.

IT IS SO ORDERED.