STATE OF MAINE                                 BUSINESS & COUNSUMER DOCKET
CUMBERLAND, ss.                                DOCKET NO. BCD-AP-16-02

STATE TAX ASSESSOR,                    )
                                       )
          Petitioner,                  )
                                       )
     v.                                )          ORDER ON CROSS MOTIONS FOR
                                       )          SUMMARY JUDGMENT
KRAFT FOODS GROUP, INC., et al.,       )
                                       )
          Respondents.                 )

Pending before the Court are two cross-motions for summary judgment in two complex

consolidated appeals of tax assessments levied against Kraft Foods Group, Inc., et al. for the 2010

tax year. Oral argument was held on August 9, 2018. Jonathan A. Block., Esq. represented Kraft

Foods Group, Inc., et al. and Thomas A. Knowlton, Esq., represented the State Tax Assessor.

## BACKGROUND

This consolidated case deals with two appeals stemming from an audit of a corporate

taxpayer's 2010 corporate income tax return. The first appeal is brought by the taxpayer and the

second is brought by the State Tax Assessor (the "Assessor"). In *State Tax Assessor v. Kraft Foods

Group, Inc.*, No. BCD-AP-16-02, the Assessor appeals from a decision of the Maine Board of Tax

Appeals (the "Board") which ruled substantially in favor of Kraft Foods Group, Inc. and the

affiliated group of taxable corporations with which it derives income from a unitary business[1]

(collectively "Kraft") on its appeal to the Board of an assessment of corporate income tax, interest,

---

[1] As explained in more detail below, Maine taxes the net income of "the entire group" of "taxable corporations that derive income from a unitary business carried on by 2 or more members of an affiliated group[,]" 36 M.R.S. § 5200(4); and "[f]or purposes of calculating the sales factor, 'total sales of the taxpayer' includes sales of the taxpayer and of any member of an affiliated group with which the taxpayer conducts a unitary business." 36 M.R.S. § 5211(14). In this Order, the Court uses "affiliated group" as shorthand to refer to "the affiliated group of taxable corporations with which Kraft Foods Group, Inc. derives income from a unitary business."

1

and penalties made by the Assessor in August 2013 pursuant to an audit of Kraft's 2010 corporate income tax return (the "First Assessment"). In the consolidated appeal of *Kraft Foods Global, Inc. v. State Tax Assessor*, No. BCD-AP-17-09, Kraft appeals from a decision on reconsideration issued by the Assessor on October 27, 2017, upholding an assessment disallowing a $306,729,484 capital loss carryforward that Kraft claimed on its 2010 Maine corporate income tax return (the "Second Assessment").

Kraft was, at all relevant times, engaged in the business of manufacturing and selling a variety of food products in Maine and across the country. (Stip. ¶ 150.) Throughout the 1980s and 1990s, Kraft purchased two companies that manufactured and sold frozen pizzas (Tombstone Pizza Company and Jack's Frozen Pizza), developed its own frozen pizza product (marketed as DiGiorno in the United States), and obtained a license to distribute a line of frozen pizzas under the California Pizza Kitchen brand name. Through these actions over the years Kraft added frozen pizzas to its diverse product line. (Stip. ¶¶ 2-3, 7-8, 10-13.) Collectively, this frozen pizza business (the intangible and tangible assets, i.e. machinery, patents, trademarks, and goodwill used to manufacture and market frozen pizza) is referred to as the "Pizza Assets" in this Order.

On March 1, 2010, Kraft sold these Pizza Assets to Nestle USA, Inc. ("Nestle") for $3,681,000,000, resulting in $3,349,462,365 in federal taxable income. (Stip. ¶¶ 173, 176-177.) Nestle paid the sale price to two members of Kraft's affiliated group: Kraft Pizza Corporation* ("KPC"), Kraft Foods Global Brands, Inc. (Stip. ¶ 177.) Kraft subsequently filed a timely 2010 Maine corporate income tax return that included KPC in its Maine unitary group and included as

---

* KPC formed in 1995 from a merger of Jack's Frozen Pizza, Inc. and Tombstone Pizza Corporation. (Stip. ¶ 10.) Thereafter, until March 2010, KPC was the corporate member of Kraft's affiliate group responsible for manufacturing, selling, and distributing frozen pizza in the United States. (Stip. ¶ 13.) KPC was dissolved in 2012. (Stip. ¶ 175.) Kraft's principal argument to the Assessor on reconsideration and to the Board on appeal was that its business was not unitary with that of KPC. (Stip. ¶¶ 206, 210.) Kraft has since stipulated that KPC was part of its affiliated group during the relevant period. (Kraft's Supp'g S.M.F. ¶ 49.)

2

unitary business income KPC's income from sales of pizza products prior to the time of Nestle's purchase of the Pizza Assets. (Stip. ¶ 183.) However, in computing its Maine net income, Kraft subtracted almost the entire gain from the sale of the Pizza Assets (the "Pizza Gain")—$3,004,347,614—from its taxable income, contending that it was "income not taxable under the Constitution of Maine or the U.S." (Stip. ¶ 184; Jt. Ex. 3.) The subtraction modification claimed by Kraft effectively excluded the Pizza Gain from Kraft's taxable income. (Stip. ¶ 184.)

In August 2013, Maine Revenue Services ("MRS") conducted an audit of Kraft for the years 2010 and 2011. (Stip. ¶ 200.) MRS adjusted Kraft's 2010 Maine corporate income tax return and disallowed the $3,004,347,614 deduction that Kraft had claimed with respect to the Pizza Gain. (Stip. ¶ 201.) MRS asserted that the Pizza Gain was part of Kraft's apportionable Maine net income, and issued an assessment—the First Assessment—against Kraft in the amount of $1,832,717 in Maine corporate income tax, plus interest and a substantial understatement penalty. (Stip. ¶¶ 201-203.)

On June 16, 2014, Kraft requested reconsideration of the First Assessment. (Stip. ¶ 206.) See 36 M.R.S. § 151(1). On reconsideration, MRS upheld the First Assessment in full. (Stip. ¶ 208.) Kraft thereafter appealed to the Board. (Stip. ¶ 209.) In its written decision (the "Board Decision"), the Board held that two separate apportionment factors should be used: one factor to apportion the Pizza Gain, and another factor to apportion the rest of Kraft's 2010 unitary business income. (Stip. ¶ 211.) Furthermore, the Board abated the substantial understatement penalty imposed by the Assessor in full on the grounds that Kraft had shown reasonable cause for its filing position. See 36 M.R.S. § 187-B(4-A). (Jt. Ex. 56 at 11.) The Assessor appealed the Board Decision on December 22, 2015, and the appeal was subsequently transferred to this Court.

3

On May 3, 2017, the Assessor issued its Second Assessment, which disallowed a $306,729,484 capital loss carryforward that Kraft claimed on its 2010 Maine corporate income tax return. (Stip. ¶ 213.) On June 1, 2017, Kraft likewise requested reconsideration of the Second Assessment on the grounds it was barred by the statute of limitations; on reconsideration, the Assessor likewise upheld the Second Assessment in full in its "Decision on Reconsideration" dated October 27, 2017 (the "Reconsideration Decision"). (Stip. ¶¶ 216, 218.) Kraft appealed that decision directly to the superior court. *See* M.R. Civ. P. 80C, *see also* 5 M.R.S. § 11002; 36 M.R.S. § 151. That appeal was also subsequently transferred to this Court; the Assessor's appeal of the Board Decision on the First Assessment and Kraft's appeal of the Reconsideration Decision on the Second Assessment were thereafter consolidated on December 21, 2017.

Both parties move for summary judgment in their favor on each appeal and, needless to say, oppose their adversary's motion for summary judgment.

## DISCUSSION

### 1. The First Assessment

#### a. Alternative Apportionment

The first issue presented to this Court on the motion is whether an alternative apportionment methodology should be used for Kraft's 2010 corporate income tax assessment.' In essence, Kraft urges this Court to adopt the findings and conclusions of the Board Decision, which held that two different apportionment factors should be used to calculate Kraft's corporate income tax liability for 2010: the Pizza Factor (to apportion the Pizza Gain) and the Kraft Factor (to

---

' Kraft has stipulated that KPC was part of Kraft's unitary business, but previously argued—to the Assessor on reconsideration and to the Board on appeal—that the Pizza Gain should not be apportioned to Kraft ;because KPC was not a member corporation of Kraft's affiliated group. The issue is therefore no longer in dispute for purposes of determining Kraft's income tax liability for the Pizza Gain, but is discussed below in the context of determining whether Kraft is entitled to an abatement of the substantial underpayment penalty the Assessor levied against Kraft.

4

apportion the rest of the income from Kraft's unitary business). The Assessor responds that the Board erred in this conclusion because Kraft failed to carry its burden to establish its entitlement to alternative apportionment.

Maine imposes an annual tax on the Maine net income of "each taxable corporation and on each group of corporations that derives income from a unitary business carried on by 2 or more members of an affiliated group." 36 M.R.S. § 5200(1). "For purposes of [determining income], with respect to taxable corporations that derive income from a unitary business carried on by 2 or more members of an affiliated group with business activity that is taxable both within and without this State, 'income' means the net income of the entire group." 36 M.R.S. § 5200(4). "The tax amount computed [with respect to the group's net income] must then be apportioned under the provisions of [36 M.R.S. §§ 5210-5212] for the entire group to determine the amount of tax imposed on the taxable corporations." 36 M.R.S. § 5200(4).

Sections 5211 through 5212 of Title 36 of the Maine Revised Statutes, titled "Apportionment of Income," describe the process by which taxable corporations and affiliated groups of corporations that "hav[e] income from business activity which is taxable both within and without this State . . . shall apportion [their] net income" for purposes of determining the "portion" of the net income subject to Maine corporate income tax. 36 M.R.S. § 5211(1). Section 5211 includes three formulas for calculating the apportionment factor to be utilized to apportion a corporation's income to Maine depending on the source of the income: property, payroll, and sales. 36 M.R.S. §§ 5211(9),(12),(14); *see E. I. Du Pont de Nemours & Co. v. State Tax Assessor*, 675 A.2d 82, 91 (Me. 1996) (citing *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 165 (1983)) ("the three-factor apportionment formula has been approved for use by the states").

5

The only apportionment factor relevant to this appeal is the sales factor. 36 M.R.S § 5211(14). "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this State during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." 36 M.R.S. § 5211(4). "Sales" is defined as "all gross receipts of the taxpayer." 36 M.R.S. § 5210(5). "For purposes of calculating the sales factor, 'total sales of the taxpayer' includes sales of the taxpayer and of any member of an affiliated group with which the taxpayer conducts a unitary business." 36 M.R.S. § 5211(14).

Where the apportionment of taxable income under section 5211 does not "fairly represent the extent of the taxpayer's business activity in this State," the taxpayer may request, or the tax assessor may require, "[t]he employment of any other method to effectuate an equitable apportionment of the taxpayer's income" with respect to all or any part of the taxpayer's business activity. 36 M.R.S. § 5211(17)(D). Where, as here, it is the taxpayer that requests alternative apportionment, the taxpayer bears the burden of proof. 36 M.R.S. § 151; *see also Gannett Co. v. State Tax Assessor*, 2008 ME 171, ¶ 34, 959 A.2d 741; *E. I. Du Pont de Nemours & Co. v. State Tax Assessor*, 675 A.2d 82, 90 (Me. 1996).

Although the parties agree that Kraft bears the burden of proof, the parties dispute whether a "clear and convincing" or simple preponderance standard of proof applies. Kraft argues that the standard is merely a preponderance of the evidence and that is the standard that the Board applied. (Jt. Ex. 56 at 9.) *See, e.g., CarMax Auto Superstores W. Coast, Inc. v. South Carolina Dep't of Revenue*, 767 S.E.2d 195, 199 (S.C. 2014) ("the proponent of the alternate formula bears the burden of pro[of] by a preponderance of the evidence"). The Assessor urges the Court to hold Kraft to a clear and convincing standard of proof. *See E.I. DuPont de Nemours & Co.*, 675 A.2d at 90 ("[W]hen the taxpayer, as here, contends that the [alternative apportionment] formula

6

ultimately adopted by the tax assessor is arbitrary and reaches unreasonable results, the burden is on the taxpayer to establish such facts by clear and convincing evidence.") The Court concludes that a preponderance standard applies here. In *E.I. DuPont de Nemours & Co.*, the Assessor applied an alternative apportionment factor pursuant to section 5211(17) and the taxpayer was advocating the application of the statutory apportionment factor. *Id.* That case is thus distinguishable. The Court concludes that where, as here, the taxpayer is arguing for the application of alternative apportionment pursuant to section 5211, it must prove that the statutory apportionment factor does not fairly represent the extent of the taxpayer's business activity in Maine by a simple preponderance of the evidence.

"The plain meaning of section 5211 is that the apportionment formula shall be varied only when it does not fairly represent the extent of the taxpayer's business activity in this State. Thus, the catch-all provision (D) is not operative in the absence of a showing on [the] record that the formula computation is not fairly representative." *Sears, Roebuck & Co. v. State Tax Assessor*, 561 A.2d 172, 173 (Me. 1989). The Law Court has cautioned that "combined reporting"—the methodology applied by the Board in this matter—should be used only when "necessary to reflect accurately the business activity of the particular taxpayer within the state." *Id.* at 174.

Kraft first claims that the undisputed facts compel a finding that the Pizza Gain is so different than Kraft's unitary income from its ordinary business activities, in both magnitude and substance, that the application of the same apportionment factor to both cannot "fairly represent the extent of [Kraft's] business activity in this State[.]" 36 M.R.S. § 5211(17)(D). The amount of the Pizza Gain dwarfs Kraft's 2010 income from its sale of food products. The magnitude of the Pizza Gain as compared to Kraft's other federal taxable income for 2010 is indeed extraordinary. Kraft reported $3,349,462,365 in federal taxable income from the sale of the Pizza Assets on its

federal consolidated corporate income tax return. (Stip. ¶ 177.) Receipts from Kraft's day-to-day sales of food products were very large—to the tune of $21 billion—but these receipts generated only a little under $190 million in taxable income for Kraft in 2010. (Kraft's Supp'g S.M.F. ¶¶ 44, 47.)

The Pizza Gain is also substantively different from Kraft's other income from its unitary business in 2010. The Pizza Gain was derived from the one-time sale of the Pizza Assets. Nestle paid for the DiGiorno/Delissio, Tombstone, and Jack's trademarks, the California Pizza Kitchen license, the frozen pizza manufacturing patents, frozen pizza manufacturing facilities and the equipment therein, goodwill, supplier agreements, and other contracts. (Stip. ¶ 169.) Nestle paid only a limited amount for food products in the form of frozen pizza inventory that had already been manufactured prior to the sale of the Pizza Assets. (Kraft's Supp'g S.M.F ¶ 40.) In other words, the Pizza Gain was not attributable to Kraft's ordinary line of business—that is, the sale of food and beverage products to consumers.

However, even assuming that Kraft has proven that the Pizza Gain was an extraordinary, one-time transaction that is entirely different than the way Kraft usually generates income, Kraft fails to connect that finding to the standard for entitlement to an alternative apportionment method: whether the application of the statutory apportionment formula "do[es] not fairly represent the extent of [its] business activity in this State[.]" Kraft was fortunate to consummate a tremendously profitable sale of an entire line of business that it developed over decades of acquisitions, product development, and licensing deals. It is undisputed that frozen pizza is one of the multitudes of food

---

• The Assessor admits that Kraft reported total sales everywhere of $21,576,915,512 but denies Kraft's total taxable income for 2010 excluding the Pizza Gain was $189,873,696. (Assessor's Opp'g S.M.F ¶¶ 44,47.) As explained below the dispute is immaterial; even accepting Kraft's numbers as true, it is irrelevant to the determination of whether alternative apportionment is required here.
• The Assessor denies that $85,730,537 of the $3+ billion purchase price was for the sale of frozen pizza inventory. (Assessor's Opp'g S.M.F. ¶ 40.) As explained below the dispute is immaterial.

8

products that Kraft sold in Maine. Thus, it is unclear why the extraordinary, one-time nature of the Pizza Gain is relevant to the issue of whether it was part of the apportionable Maine net income of Kraft in 2010, or its inclusion in the denominator of the sales factor and the application of that sales factor to the Pizza Gain and the rest of Kraft's "sales everywhere" would result in an unfair representation of Kraft's business activities in Maine.[*] 36 M.R.S. § 5211(14),(17).

However, Kraft also argues that there are facts to support a finding that the Pizza Gain has a limited connection to Maine. Kraft points out that the Pizza Gain was paid by Nestle for the assets of a specific business—the frozen pizza business—and virtually none of those assets were located in Maine; the tangible assets were for the most part[**] not located in Maine, and while the intangible assets were used to market Kraft's frozen pizza products in Maine these advertising efforts were apparently less extensive than in other states. (Kraft's Supp'g S.M.F. ¶¶ 4, 36-37.) However, the Court concludes that these facts are likewise of limited relevance to resolving the issue of whether using one Maine sales factor to apportion the Pizza Gain does not fairly represent the extent of Kraft's business activity in the State. It is not surprising that Kraft devoted less resources to advertise frozen pizzas in Maine than elsewhere; Maine has a smaller and more rural population than most other states. If the relevant inquiry for entitlement to alternative apportionment were whether a corporation (or affiliated group of corporations) conducted more or less of its business activity in Maine as opposed to other states, virtually every national and multinational corporation that does business in the United States would be entitled to alternative

---

[*] The Board credited three "key facts" in reaching its conclusion that Kraft was entitled to alternative apportionment through the application of a distinct apportionment factor to the Pizza Gain. The final two "key facts" were (1) "Kraft's gain from the sale of its Pizza Assets is not derived from sales of food products" and (2) "the size of the gain from the sale dwarf's Kraft's 2010 income from its sales of food products." (Jt. Ex. 56 at 8.) As explained above the Court does not disagree with these findings but disagrees with the Board that they are relevant to a determination of whether statutory apportionment "do[es] not fairly represent the extent of [its] business activity in this State[.]" 36 M.R.S. § 5211(17).

[**] Part of the sale of the Pizza Assets to Nestle involved Nestle's purchase Kraft's limited extant frozen pizza inventory and approximately $128,000 worth of this inventory was located in Maine. (Kraft's Supp'g S.M.F. ¶ 37.)

apportionment on that ground. In fact, KPC grossed $1,109,108 from sales of frozen pizzas in Maine over the first three months of 2010 before Kraft's sale of the Pizza Assets to Nestle on March 1, 2010. (Stip. ¶ 155.) In 2008 and 2009, when KPC sold frozen pizzas in Maine over the course of an entire year, KPC grossed $3,875,177 and $4,350,242 respectively from the sales of frozen pizzas in Maine. (Stip. ¶ 155.) The Court concludes that regardless of where Kraft manufactured and marketed its frozen pizzas, KPC realized taxable sales of frozen pizzas in Maine historically and in 2010, just as it did with other processed food products. (*See* Stip. ¶¶ 150-153.) Thus, the application of the statutorily mandated sales factor to the Pizza Gain fairly represents the extent of Kraft's frozen pizza-related business activities in Maine, just as it does for the rest of Kraft's product lines.

Kraft further argues that alternative apportionment should be used to apportion the Pizza Gain because the food products produced with the Pizza Assets (i.e., frozen pizza) sold to Nestle had less to do with Maine than other Kraft food products. If independently calculated, KPC's sales factor is indeed lower* than Kraft's universal Maine sales factor;* although KPC's apportionment factor would not be the lowest in the group if the apportionment factor for each of Kraft's affiliated corporations were calculated separately. (Kraft's Br. 12-13.) Regardless, the fact that one member of an affiliated group of corporations does more or less of its share of business in Maine than another member corporation cannot mean that taxing both corporations by the same sales factor does not fairly represent the extent of the affiliated group's business activity in Maine. Such a rule

---

* This was the first of the three "key facts" credited by the Board. (Jt. Ex. 56 at 8.) The Court agrees with the Board that this fact bears on the standard Kraft must meet to prove its entitlement to alternative apportionment under section 5211(17). However, as explained in more detail below, the Court does not find that Kraft has proved that KPC's Maine sales factor is "significantly" smaller than Kraft's sales factor, as found by the Board. (Jt. Ex. 56 at 8.)

* As the Assessor points out, Kraft does not commit to a particular number for the Pizza Factor, suggesting that it may be 0.1115%, 0.2999%, or 0.3322% depending on how it is calculated, but unsurprisingly claims that the smallest number is the most accurate. Regardless, even the largest of the suggested figures is less than half of Kraft's sales factor.

10

would swallow the general rule provided for in 36 M.R.S. § 5200(4) that the net income of the entire group of affiliated corporations is to be taxed at the same rate. The Legislature could not have intended the alternative apportionment provision of section 5211(17) to be an end-run around the requirement that a group of affiliated corporations be taxed as a group. Kraft characterizes KPC's business in Maine as relatively "miniscule" when compared to Kraft's other affiliated corporations, but as noted above, KPC sold over a million dollars' worth of frozen pizza in Maine in the first three months of 2010. In fact, Kraft grossed more from its sale of frozen pizzas in Maine than from several other product lines. (Stip. ¶¶ 162-167.) In a hypothetical case where a taxpayer could prove that one member-corporation of the taxpayer's affiliated group had truly de minimis business activity in Maine when compared with the other corporations in the group, then section 5211(17) could potentially apply. Here, however, Kraft has failed to make such a showing.

Finally, Kraft argues that alternative apportionment is constitutionally required because the use of the statutory sales factor to apportion the Pizza Gain would violate the Due Process Clause[16] of the U.S. Constitution. *See Container Corp. v. Franchise Tax Bd.*, 463 U.S. 159 (1983). The Due Process Clause requires that a state tax apportionment formula be both "externally consistent" and internally consistent. *Id.* at 169-70. Here, Kraft claims that only the "external consistency test" is implicated. Under the external consistency test, "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." *Id.* at 169. Courts will "strike down the application of an apportionment formula if the taxpayer can prove by clear and cogent evidence that the income attributed to the State is in fact out of all appropriate

---

[16] U.S. Const. amend. XIV, § 1. Kraft cites both the Due Process Clause and the Commerce Clause of the U.S. Constitution in its brief, buts its argument is grounded only in the external consistency test applied to state tax statutes as required by the Due Process Clause.

proportions to the business transacted . . . in that State . . . or has led to a grossly distorted result." *Id*. at 170 (quotations omitted).

The Court disagrees that the application of the statutory sales factor to the Pizza Gain violates the external consistency test. The sales factor is calculated by dividing the "total sales of the taxpayer in this State during the tax period" by "the total sales of the taxpayer everywhere during the tax period." 36 M.R.S. § 5211(14). "Total sales of the taxpayer includes sales . . . of [every] member of an affiliated group with which the taxpayer conducts a unitary business." *Id*. In other words, it is not "out of all appropriate proportions to the business transacted" in Maine; it is *the* proportion of Kraft's total sales that took place in Maine as opposed to Kraft's total sales everywhere. *Cf. Container Corp.*, 463 U.S. at 170.

Kraft analogizes the instant case to *Hans Rees' Sons, Inc. v. North Carolina*, 283 U.S. 123 (1931) where the U.S. Supreme Court struck down North Carolina's statutory method of apportionment on the grounds that "the statutory method, as applied to the appellant's business for the years in question operated unreasonably and arbitrarily, in attributing to North Carolina a percentage of income out of all appropriate proportion to the business transacted by the appellant in that State." *Id*. at 135. There, the plaintiff-taxpayer generated income from three sources in both North Carolina and New York. *Id*. at 126-127. However, in that case, "the average income having its source in the manufacturing and tanning operations within the State of North Carolina was seventeen [percent], while under the assessments in question, there was allocated to the State of North Carolina approximately eighty [percent] of the appellant's income." *Id*. at 134. *Hans Rees' Sons* is thus distinguishable from the case at hand. Maine's apportionment factor determines the percent of Kraft's income "having its source" in Maine and then applies that factor equally to each of Kraft's corporate members that contributed to that income. By contrast, in *Hans Rees' Sons*,

North Carolina argued that "where a corporation manufactures in one State and sells in another, the net profits of the entire transaction, as a unitary enterprise, may be attributed, regardless of evidence, to either State." *Id.* at 132. Thus, even if "the manufacturing and tanning operations" of the plaintiff-taxpayer in *Hans Rees' Sons* are analogous to KPC's relationship to Kraft, Maine's apportionment formula does not run into the same constitutional problem presented in that case. Maine does not attempt to attribute the net profits of the entire transaction (the sale of the Pizza Assets) exclusively to the State of Maine, but only to apportion a small percentage of the profits of the transaction reflective of Kraft's business activities in Maine.

Both in arguing its statutory and constitutional entitlement to alternative apportionment, Kraft frequently alleges that the application of the statutory sales factor to the Pizza Gain results in "distortion," but Kraft seems to confuse "distortion" as that word is used in the case law with what is essentially just an atypically large tax liability resulting from an atypically profitable tax year. Kraft was fortunate to realize an enormous profit when it sold an entire line of business to a competitor. That line of business, like many of Kraft's other product lines, was active in Maine as it was in other states; Maine only seeks to tax a small percentage of the profit realized, calculated by reference to Kraft's business activity in Maine. Alternative apportionment should be reserved for those extreme cases where its application is necessary to avoid constitutional problems or where the default apportionment factor "fail[s] to accurately reflect a corporation's income due to the corporation's unique characteristics." *E.I. DuPont de Nemours*, 675 A.2d at 89; *see also Sears, Roebuck & Co.*, 561 A.2d at 173 ("the apportionment formula shall be varied only when it does not fairly represent the extent of the taxpayer's business activity in this State"). It is not simply a mechanism for lowering a corporation's tax liability when the corporation is assessed a larger-than-normal tax bill resulting from a single highly profitable transaction.

13

In sum, Kraft has failed to meet its burden of proving its entitlement to alternative apportionment pursuant to 36 M.R.S. § 5211(17). The Board's holding to the contrary is reversed.

b. Substantial Understatement Penalty

The First Assessment assessed a substantial understatement penalty against Kraft in the amount of $458,179.25 pursuant to 36 M.R.S. § 187-B(4-A). Pursuant to that statute, a person that files a tax return "that results in an underpayment of tax, any portion of which is attributable to a substantial understatement of tax," is liable for a penalty of up to 24% of the understatement. "There is a substantial understatement of tax if the amount of the understatement on the return . . . exceeds 10% of the total tax required to be shown on the return." *Id.* "The assessor shall . . . abate . . . any penalty . . . if grounds constituting reasonable cause are established by the taxpayer . . . ." 36 M.R.S. § 187-B(7). "Reasonable cause includes . . . [whether] the taxpayer has supplied substantial authority justifying the failure to pay." 36 M.R.S. § 187-B(7)(F). As noted by our Law Court, "[a]lthough substantial authority is not defined in the Maine statutes, federal tax law defines the term as

> an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the 'more likely than not' standard . . . but more stringent than the reasonable basis standard . . . . There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."

*John Swenson Granite, Inc. v. State Tax Assessor*, 685 A.2d 425, 429 n.3 (Me. 1996) (quoting 26 C.F.R. §§ 1.6662-4(d)(2),(3) (1996)). A taxpayer may prove entitlement to penalty abatement by providing substantial authority for its failure to pay a tax even if the authority provided is ultimately determined to be erroneous. *Victor Bravo Aviation, LLC v. State Tax Assessor*, 2011 ME 50, ¶ 25, 17 A.3d 1237.

14

In the first instance, Kraft decided to subtract the Pizza Gain from their 2010 Maine taxable income on the basis that the income so derived was not taxable by Maine because the Pizza Gain was not a sale in the ordinary course of Kraft's unitary business activities. Kraft thus treated the Pizza Gain as non-unitary income, but nonetheless included KPC on the unitary combined report for 2010 and included income from the sales of frozen pizzas as unitary income. Kraft has since conceded that this filing position was theoretically flawed and that it should have requested alternative apportionment as ordered by the Board and reversed by this Court above. However, Kraft maintains that its filing position was nonetheless understandable because there is substantial authority for the position that KPC was not part of Kraft's affiliated group.

As pointed out by the Assessor, there is an inconsistency in Kraft's argument. Kraft seems to conflate its initial reason for excluding the Pizza Gain from its Maine taxable income (the income so derived was not "unitary business income," while the rest of KPC's income presumably was) with the argument it now makes to this Court, specifically that "there is substantial authority for a determination that KPC was *not* unitary, [therefore] the 'substantial understatement' falls to zero—there is no penalty due." (Kraft's Br. 19.)

Kraft's shifting justification is not the problem. The substantial authority standard is an objective one and Kraft's subjective reason for subtracting the Pizza Gain in the first instance is irrelevant to the analysis. The problem is that the justification that Kraft has settled on ("there is substantial authority for a determination that KPC was *not* unitary, [therefore] the 'substantial understatement' falls to zero—there is no penalty due") is a non sequitur.

It is undisputed that Nestle paid the sale price to two different Kraft corporations: KPC and Kraft Foods Global Brands, Inc. (Stip. ¶ 177.) Thus, even if KPC was not a member of the affiliated group, the portion of the Pizza Gain allocated to Kraft Foods Global Brands would nonetheless be

15

part of the net income of the entire affiliated group. Put another way, the substantial understatement would not fall to zero. Only KPC's share of the gain—$2,028,162,365—would be subtracted. (Stip. ¶ 177.) Thus, even if Kraft did have substantial authority for its position that KPC is not part of its affiliated group, this reduces the amount of the understatement subject to penalty by only that amount. Kraft does not argue that there was substantial authority for the position that Kraft Foods Global Brands' was not a member of its affiliated group. Under Kraft's chosen theory, Kraft understated the net income of its affiliated group by $1,321,300,000—the amount of the Pizza Gain allocated to Kraft Foods Global Brands.

That being said, the Court is satisfied that Kraft has met the modest standard of proof ("less stringent than the 'more likely than not' standard . . . but more stringent than the reasonable basis standard") required for providing substantial authority for the proposition that KPC was not a member corporation of Kraft's affiliated group. *See John Swenson Granite, Inc.*, 685 A.2d at 429 n.3. "'Unitary business' means a business activity which is characterized by unity of ownership, functional integration, centralization of management and economies of scale." 36 M.R.S. § 5102(10-A). Where all the "activities [of an affiliated group of corporations] are in the same general line or type of business" there is a "strong presumption that the activities of the . . . group constitute a single trade or business[.]" 18-125 C.M.R. ch. 801, § 2(A). "[W]hether a business is unitary is determined on a case-by-case basis, after examining all of the relevant facts and circumstances." *Gannett Co.*, 2008 ME 171, ¶ 14, 959 A.2d 741.

On balance, there are more facts to support a conclusion that KPC is unitary with Kraft. It is undisputed that there is unity of ownership between Kraft and KPC and there can be no real debate that KPC benefitted from the economies of scale provided by its affiliation with Kraft. The presumption required by 18-125 C.M.R. ch. 801, § 2(A) applies in any event as KPC and the rest

16

of Kraft's affiliated corporations are in the same general line or type of business: the prepared foods business. But there are nonetheless some factors to support an objective determination that KPC's business lacked the functional integration and centralization of management characteristic of a unitary business.

For example, KPC provided important functions internally, such as manufacturing, marketing, and sales. KPC had separate manufacturing facilities, in-house marketing and sales teams, and a unique distribution and delivery model: the "direct store delivery" or "DSD" model. (Stip. ¶¶ 27-28, 31 This DSD model is distinct from the "warehouse" or "wall-to-wall" strategy utilized for the rest" of Kraft's products. (Stip. ¶¶ 32-35.) KPC also had its own consumer insights and new product development team, human resources department, executive management group, operations team, and finance team. (Stip. ¶ 28.) Many of Kraft's other affiliates relied on Kraft Foods Global, Inc. for these functions, although they each also enjoyed some independence in their own right. (Stip. ¶¶ 38-47.)

Notwithstanding these facts, if the standard were whether it was more likely than not that KPC was not part of Kraft's unitary business, then Kraft would not prevail. However, the Court concludes that Kraft has met the lesser standard of substantial authority adopted by the Law Court in *John Swenson Granite, Inc.*, 685 A.2d at 429 n.3, given the fact-intensive, almost ad hoc determination of whether a corporation is engaged in a unitary business and the presence of the factors listed above. *See Gannett Co.*, 2008 ME 171, ¶ 14, 959 A.2d 741. Kraft is entitled to an abatement of its substantial understatement penalty reflecting a subtraction of $2,028,162,365 from the net income of its affiliated group. The tax resulting from the remainder of the Pizza Gain, the $1,321,300,000 for which Kraft has offered no substantial authority for failing to report as

---

" With the exception of "Nabisco" branded products.

income derived from a unitary business, remains subject to the full substantial understatement penalty provided for in 36 M.R.S. § 187-B(4-A).

2. The Second Assessment

The validity of the Second Assessment turns on whether a three-year or six-year statute of limitations applies to the Assessment. The Second Assessment was assessed against Kraft on May 3, 2017 with respect to its 2010 corporate income tax return filed October 17, 2011. (Stip. ¶¶ 183, 215.)

"Except as [otherwise] provided . . . , an assessment may not be made after 3 years from the date the return was filed or 3 years from the date the return was required to be filed, whichever is later." 36 M.R.S. § 141(1). However, "[a]n assessment may be made within 6 years from the date the return was filed if the tax liability shown on the return . . . is less than 1/2 of the tax liability determined by the assessor. In determining whether the 50% threshold . . . is satisfied, the assessor may not consider any portion of the understated tax liability for which the taxpayer has substantial authority supporting its decision." 36 M.R.S. § 141(2). Kraft does not argue that it had substantial authority for deducting the $306,729,484 capital loss carryforward that Kraft claimed on its 2010 Maine corporate income tax return, instead relying exclusively on the proposition that it did have substantial authority for deducting the $3+ billion Pizza Gain which would bring it well within the 50% threshold and result in a three-year statute of limitations.

The Court held above that Kraft had substantial authority for deducting $2,028,162,365 of the Pizza Gain from its corporate income tax return on the erroneous (but sufficiently reasonable) ground that KPC was not a member of Kraft's affiliated group. However, this nonetheless means that Kraft underreported its income by $1,321,300,000 because Kraft had no substantial authority for subtracting that portion of the gain, which was paid to Kraft Foods Global Brands. Furthermore,

18

Kraft lacked substantial authority for subtracting an additional $306,729,484 as a capital loss carryforward. Even subtracting that portion of the Pizza Gain that Kraft had "substantial authority" to exclude, Kraft nonetheless underreported its income everywhere by over a billion dollar and claimed a $306,729,484 "capital loss carryforward" reduction in its taxable income for which it lacked substantial authority. The tax liability shown on Kraft's 2010 corporate income tax return was therefore less than one-half of the tax liability determined by the Assessor, even when that portion of the understated tax liability for which the taxpayer had substantial authority supporting its decision is not considered. The exception provided for in 36 M.R.S. § 141(2) is satisfied and a six-year statute of limitations applies. The Second Assessment was timely.

CONCLUSION

Based on the foregoing it is hereby ORDERED:

As to the First Assessment, appealed from the Board Decision by the Assessor in No. BCD-AP-16-02: The Assessor's motion for summary judgment is GRANTED in part and DENIED in part. The decision of the Maine Board of Tax Appeals, Docket No. BTA-2015-1 issued May November 5, 2015, is reversed. The matter is remanded to the State Tax Assessor for recalculation of the substantial understatement penalty with the abatement provided for above. Kraft's motion for summary judgment is GRANTED in part and DENIED in part. Kraft's motion is GRANTED only to the extent that it is entitled to a partial abatement of the substantial underpayment penalty as described above, in all other respects Kraft's motion is DENIED.

As to the Second Assessment, appealed from the decision on reconsideration by Kraft in No. BCD-AP-17-09: The Assessor's motion for summary judgment is GRANTED. The Second

19

Assessment is SUSTAINED. Kraft's motion is DENIED. Kraft is ORDERED to pay the amount ordered in the supplemental assessment including the penalty and interest provided for therein.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 12-14-18

M. Michaela Murphy
Justice, Business and Consumer Court

Entered on the Docket: 12/5/18
Copies sent via Mail___Electronically ✓

20

STATE OF MAINE
CUMBERLAND, SS.

STATE TAX ASSESSOR,

     Petitioner,

v.

KRAFT FOODS GROUP, INC.,
KRAFT FOODS GLOBAL, INC.,
KRAFT PIZZA COMPANY, and
CADBURY ADAMS USA LLC,

     Respondents.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-AP-16-02 ✓

**ORDER ON PENDING MOTIONS**

Presently before the court are the following motions: (1) the State Tax Assessor's (the "Assessor") motion for an order compelling non-party Mondeléz International, Inc. ("Mondeléz") to comply with a subpoena for the production of documents; (2) the Assessor's motion to compel Respondents Kraft Foods Group, Inc., Kraft Foods Global, Inc., Kraft Pizza Company, and Cadbury Adams USA LLC (collectively "Kraft" or "Kraft Respondents") to provide deposition testimony; and (3) Kraft's motion to bifurcate this matter. That State Tax Assessor is represented by Assistant Attorneys General Thomas Knowlton and Kim Patwardhan. Kraft is represented by Attorneys Jonathan Block and Sarah Beard. Mondelez is represented by Attorney Roy Pierce. Oral argument on these motions was heard on May 12, 2017.

## I.    BACKGROUND

The following background information is taken from the Assessor's petition for review. Since at least 1997, Kraft and its affiliates have filed Maine corporate income tax returns reporting that Kraft Foods, Inc. and its affiliates constitute a "unitary business." (Pet. ¶ 18.); *see* 36 M.R.S. § 5102(10-A). In 2010, Kraft sold certain assets related to its frozen pizza and frozen

food business (the "Frozen Food Assets") to another company. (*Id.* ¶ 19.) As a result of the sale, Kraft Food Global Brands LLC, Kraft Foods Global, Inc., and Kraft Pizza Company ("KPC"), recognized a roughly $3 billion capital gain. (*Id.* ¶¶ 23-24.) In its 2010 Maine income tax return, Kraft claimed a deduction for the entire $3 billion gain, asserting that the gain was "non-unitary" income. (*Id.* ¶¶ 31, 38.) The Assessor disallowed the deduction of the roughly $3 billion capital gain and assessed penalties against Kraft. (*Id.* ¶¶ 34, 36.) Kraft's request for reconsideration was denied. (*Id.* ¶ 40.) Kraft appealed the decision to the Maine Board of Tax Appeals (the "Board"), which held that KPC was part of Kraft's unitary business, but granted Kraft's request for an alternative apportionment formula and abated the assessed penalties. (*Id.* ¶¶ 42, 47.) On December 24, 2015, the Assessor filed a petition for judicial review pursuant to 36 M.R.S. § 151-D(10)(I), 5 M.R.S. § 11002, and Maine Rule of Civil Procedure 80C. This matter was subsequently transferred to the Business and Consumer Court.

On February 17, 2017, the Assessor filed a motion to compel Kraft's former corporate parent, non-party Mondeléz, to comply with a subpoena for the production of documents. Mondeléz filed an opposition on March 3, 2017. At the request of the court, Kraft filed a response on March 3, 2017, setting forth its position regarding the alternative apportionment issue in order to help the court evaluate the motion against Mondeléz. The Assessor timely replied on March 10, 2017. The Assessor also filed a motion to compel Kraft to provide deposition testimony on March 3, 2017. Kraft filed its opposition on March 24, 2017. The Assessor replied on March 31, 2017. Kraft filed a motion to bifurcate this matter on March 24, 2017. The Assessor filed an opposition to the motion to bifurcate on April 5, 2017. Kraft filed a reply to its motion on April 12, 2017. Oral argument on all pending motions was held on May 12, 2017. On May 17, 2017, at the court's invitation, the Assessor submitted a letter responding

2

to legal authority provided by Kraft during oral argument. Kraft also filed a letter regarding the additional legal authority on May 18, 2017.

## II.    KRAFT'S MOTION TO BIFURCATE

The Court first addresses Kraft's motion to bifurcate this case into two consecutive proceedings. Kraft contends there are only two issues in this case: (1) whether the alternative apportionment formula fairly represented the extent of Kraft's business activities in Maine in 2010; and (2) whether there was reasonable cause to abate the penalties assessed against Kraft. (Kraft Mot. Bifurcate 1-2.) Kraft contends that the Assessor's motion to compel deposition testimony regarding its income tax returns from other states and tax accrual work papers relates only to the penalty issue, not the apportionment issue. (*Id.* at 2.) Kraft argues that these discovery issues involve complex and novel questions of law. (*Id.*) Kraft also argues that the penalty issue involves a much smaller dollar amount ($458,179.00) than the apportionment issue ($1.8 million). (*Id.* at 3.) Kraft contends that the court should bifurcate these proceedings and decide the more significant apportionment issue first. (*Id.*) Kraft asserts that, if it prevails on the apportionment issue, most of the penalty would disappear and it would "probably" not contest the remaining penalty. (*Id.*) The court would avoid deciding the novel and complex discovery issues regarding the penalty issue. (*Id.*) Thus, according to Kraft, it is in the interest of judicial economy to bifurcate this matter.

The Assessor contends that bifurcation would be inconvenient and inefficient. (Assessor Opp'n Mot. Bifurcate 4.) The Assessor asserts that the discovery sought is relevant to both the apportionment and penalty issues. (*Id.* at 5.) The Assessor also asserts that, if the court were to bifurcate this matter, it would likely be forced to conduct discovery from the same witnesses

3

twice. (*Id.*) The court would also be required to hear much of the same evidence from the same witnesses twice. (*Id.* at 6.)

Maine Rule of Civil Procedure 42 provides, "The court in furtherance of convenience or to avoid prejudice may order a separate trial … of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues." M.R. Civ. P. 42(b). In ordering separate trials, "the court shall give due regard to the convenience of parties and witnesses and the interests of justice." M.R. Civ. P. 42(c). The following factors weigh against separation: (1) the substantial identity of parties and witnesses; (2) overlapping evidence; (3) relatively simple issues; (4) the time required to litigate different issues; and (5) the absence of discernable prejudice to the parties. *Estate of McCormick*, 2001 ME 24, ¶ 40, 765 A.2d 552.

Here, the only parties involved in this litigation are the Assessor and the four Kraft Respondents. This matter will be decided by the court *de novo* without a jury. *See* 36 M.R.S. § 151(2)(G). Moreover, the apportionment and penalty issues in this matter are intertwined. Much of the documentary evidence and witness testimony regarding whether the alternative apportionment formula fairly represented the extent of Kraft's business activities in Maine will be relevant to whether Kraft had substantial authority for its filing position and whether there was reasonable cause for abatement. *See* 36 M.R.S. § 5211(17); 36 M.R.S. § 187-B(7). Furthermore, Kraft has identified no prejudice caused to it by trying these issues together. All of these factors weigh against separating the issues. Therefore, the court declines to bifurcate this matter.

4

## III. ASSESSOR'S MOTION TO COMPEL MONDELÉZ TO COMPLY WITH SUBPEONA

On December 1, 2016, the Assessor served a subpoena on non-party Mondeléz, Kraft's former corporate parent, for the production of three categories of documents. (Assessor Mot. Compel 4; Mondeléz Opp'n to Mot. Compel 1 n.1.) Mondeléz provided documents in response to the second and third categories. (*Id.*) Category 1 of the subpoena requested all minutes of board of directors, and committees thereof, for the period of January 2009 through December 2011 for Kraft Foods, Inc., which is not a party to the action, and all four Kraft Respondents. (*Id.* at 4-5.) The Assessor later agreed to remove the year 2011 from its request, thus limiting the scope of category 1 to the years 2009 and 2010. (*Id.* at 5-6.) The Assessor also contends that Kraft Food Group, Inc. did not exist during 2009 and 2010 and that Cadbury Adams USA LLC only joined the Kraft-affiliated group during 2010. (*Id.* at 6.) Thus, according to the Assessor, its subpoena is essentially limited to only the minutes from KPC, Kraft Foods, Inc., and Kraft Foods Global, Inc. for the two years. (*Id.*) The parties agree that some of the requested meeting minutes have already been provided to the Assessor by Kraft. (Mondeléz Opp'n to Mot. Compel 4; Assessor Reply to Mot. Compel 2.) Mondeléz objects to producing the remaining documents in Category 1. (Mondeléz Opp'n to Mot. Compel 1.)

The Assessor asserts that category 1 of its subpoena is neither overbroad nor unduly burdensome on Mondeléz. (Assessor Mot. Compel 5-6.) The Assessor also asserts that documents sought in category 1 of its subpoena are both relevant and "reasonably calculated to lead to the discovery of admissible evidence." (*Id.* at 6.) The Assessor contends Kraft will argue, as it did before the Board, that KPC is separate from and unrelated to Kraft's other businesses, and therefore, the regular apportionment formula does not fairly reflect KPC's business activity in Maine. (*Id.*) The Assessor asserts the Category 1 documents, the minutes

5

from board of directors meeting and committees thereof, are directly relevant to whether Kraft and KPC are a "unitary business" under Maine Income Tax Law. (*Id.* at 7.) The Assessor further contends that Kraft is also seeking the abatement of penalties on the grounds that it had "substantial authority" for its filing position that the sale of the Frozen Food Assets was not part of Kraft's unitary business income. (*Id.* at 7-8.) The Assessor argues that the Category 1 documents are also relevant to its position that no well-reasoned construction of the tax statute would support Kraft's position. (*Id.* at 8.)

In response, Mondeléz contends the Assessor mischaracterizes Kraft's position. (Mondeléz Opp'n to Mot. Compel 2.) Kraft is no longer asserting that KPC's business was separate from and unrelated to its other activities in Maine. (*Id.*) Rather, Kraft is now simply arguing that the one-time gain from the sale of the Frozen Food Assets was unrelated to Kraft's activities in Maine and that it was entitled to an alternative apportionment method for the one-time gain. (*Id.* at 2-3.) Mondeléz contends, because Kraft is no longer arguing that KPC was separate from its unitary business, the requested meeting minutes are not relevant to whether an alternative apportionment method was appropriate. (*Id.* at 3.) Mondeléz further argues the requested documents are also irrelevant to the abatement of assessed penalties. (*Id.*) Though Kraft has abandoned its argument that KPC was not a part of its unitary business, Kraft still contends that it had "substantial authority" for its position when it filed its return for 2010. (*Id.*) Mondeléz contends that the Assessor no longer needs to demonstrate that Kraft and KPC were a unitary business. (*Id.*) According to Mondeléz, the question of whether Kraft had substantial authority for its position concerns only the state of the legal authority at the time the return was filed. (*Id.*)

6

In its reply, the Assessor argues that, regardless of Kraft's new position, it should be permitted to both discover and present evidence regarding KPC's and Kraft's business activities in order to demonstrate there is no basis for treating the sale of the Frozen Food Assets differently from Kraft's unitary business activities. (Assessor Reply to Mot. Compel 3-4.) The Assessor also argues that whether Kraft had "substantial authority" for its position when it filed its return for 2010 does not merely turn on the state of the law at that time, but necessarily requires the application of the law to facts about Kraft's businesses. (*Id.* at 4.) Thus, according to the Assessor, it should be permitted to discover evidence tending to support its position. (*Id.* at 4-5.)

Pursuant to the Maine Rules of Civil Procedure, the court may issue orders as justice requires to protect any party or person from whom discovery is sought from any undue burden or expense. M.R. Civ. P. 26(c), 45(c)(1). However, the purpose of the discovery rules is to enforce full disclosure. *St. Paul Ins. Co. v. Hayes*, 2001 ME 71, ¶ 8, 770 A.2d 611. Thus, the rules of discovery are to be construed liberally. *Id.* Maine Rule of Civil Procedure 26(b) provides:

> Parties may obtain discovery regarding **any matter, not privileged, which is relevant to the subject matter involved in the pending action,** whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, ... It is not ground for objection that the information sought will be inadmissible at the trial **if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.**"

M.R. Civ. P. 26(b)(1) (emphasis supplied). "Discovery is not necessarily limited to the issues framed by the pleadings or even to the subject matter of the merits of the case,..." 2 Harvey, *Maine Civil Practice* § 26:3 at 627 (3d ed. 2011) (footnote omitted). "The rule contemplates the disclosure of information that will permit the parties to define the issues and to obtain evidence on all matters potentially involved in the litigation, whether or not those matters relate to specific evidence that will be introduced at trial." *Id.* § 26:3 at 627-28. "[A] party is not limited to

7

discovery related to its adversary's framing of the issues or even to the merits of the case, as long as the discovery properly relates to the subject matter involved in the action. Thus, a party may pursue discovery based on its own theory of the case..." *Id.* § 26:3 at 629 (footnote omitted).

Although Kraft has changed its position, the Assessor is permitted to discover evidence related to its theory that there is no basis for treating the sale of the Frozen Food Assets differently from Kraft's unitary business activities. The requested Category 1 documents relate to that subject, and therefore, appear to be "reasonably calculated to lead to the discovery of admissible evidence." Moreover, Mondeléz has failed to demonstrate that the Assessor's request is overbroad or unduly burdensome. Mondeléz has conceded that it has already provided some of the requested documents to Kraft. (Mondeléz Opp'n to Mot. Compel 4.) Therefore, the Assessor's motion for an order compelling Mondeléz to comply with the subpoena for the production of documents shall be granted.

## IV. ASSESSOR'S MOTION TO COMPEL KRAFT TO PROVIDE DEPOSITION TESTIMONY

On February 1, 2017, the Assessor served Notices of Deposition on three of the Kraft Respondents: Kraft Foods Global, Inc., Kraft Foods Group, Inc., and KPC. (Assessor Mot. Compl. 4.) The three Notices listed twenty-seven items for deposition. (*Id.*) The Assessor now seeks an order compelling Kraft to provide deposition testimony regarding Item Nos. 13 and 25 in the Notices. (*Id.*) Item No. 13 seeks deposition testimony regarding Kraft's "'state income tax returns and combined reports filed by Kraft Foods and its affiliates for 2008 – 2011 in others states, including without limitation California, Illinois, Kansas, Montana, and Wisconsin, and any audits or assessments by those states related to those returns.'" (*Id.* at 5.) The Assessor concedes it is willing to limit its request to 2008 – 2010. (*Id.*) Item No. 25 seeks deposition testimony regarding "'financial statements prepared by or on behalf of Kraft Foods and its

8

affiliates for 2008 – 2011, including without limitation any statements or disclosures concerning potential state income tax liabilities resulting from the capital gain at issue in this case…'" (*Id.* at 9.) The Assessor concedes it is willing to limit its request to 2009 – 2011. (*Id.*)

A.    Item No. 13: Kraft's income tax returns filed in other states for 2008 – 2010

The Assessor contends that Kraft's primary objection to providing deposition testimony regarding its income tax returns filed in other states is a lack of relevancy. (*Id.* at 5.) According to the Assessor, Kraft's position is that its filing position in other states is no longer relevant because Kraft has stipulated that that KPC was part of its unitary business in 2010. (*Id.*) However, the Assessor contends that Kraft has not stipulated to any of the predicate facts establishing it is a unitary business and that those predicate facts are still relevant to the primary issue in the case: whether KPC's sale of the Frozen Food Assets is sufficiently unrelated Kraft's business activities in Maine to warrant an alternative apportionment method. (*Id.*) The Assessor asserts that testimony regarding Kraft's income tax returns for other states is discoverable because it is reasonably likely to lead to admissible evidence regarding Kraft business activities. (*Id.* at 6.) The Assessor cites *Gannett Co. v. State Tax Assessor*, 2008 ME 171, ¶ 6, 959 A.2d 741, for the proposition that our Law Court has found a taxpayer's income tax returns for other states to be relevant to determining whether the taxpayer's activities comprised a unitary business and whether a large capital gain was apportionable to Maine. (*Id.* at 6-7.)

The court disagrees with the Assessor's interpretation of *Gannett*. As part of its recitation of the background facts in *Gannett*, the Law Court noted that the taxpayer had filed as a unitary business in nine other states for 1998 – 2000 and that the taxpayer had also declared in its 2000 Kansas income tax return that the affiliate which generated the capital gain at issue was part of its unitary business. *Gannett*, 2008 ME 171, ¶ 6, 959 A.2d 741. However, in its analysis

9

of whether the taxpayer and its affiliates constituted a unitary business, the Law Court did not mention or consider the taxpayer's income tax returns for other states. *Id.* ¶¶ 15-27. Rather, the Law Court analyzed the facts and circumstances of the taxpayer's actual activities to determine whether the taxpayer and its affiliates demonstrated the "hallmarks" of a unitary business: functional integration, centralized management, and economies of scale. *Id.* ¶ 13. The Law Court found the taxpayer and its affiliates to be a unitary business based on the taxpayer's "provision of intercompany services, the sharing of expertise among affiliates, its centralized health and benefit plans, the interlocking directors and officers, and its cash management system," not its income tax returns from other states. *Id.* ¶ 27. Similarly, in its analysis whether the State's apportionment formula was fair or resulted in a gross distortion, the Law Court again looked to the facts and circumstances of the taxpayer's activities in Maine. *Id.* ¶¶ 28-36. The Law Court's conclusion that the State's apportionment formula did not result in a gross distortion was not based on the taxpayer's filing positions in other states. *Id.* ¶ 36. Therefore, *Gannett* does not stand for the broad proposition asserted by the Assessor.

Kraft objects to the Assessor's request for deposition testimony regarding its income tax returns, combined reports, and any related audits or assessments on the ground that the request is unduly burdensome, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. (Kraft Opp'n to Mot. Compel 1-2.) Kraft notes that the Superior Court has previously denied a discovery request by the Assessor for a taxpayer's filing position in other states. (*Id.* at 2, Attach. A.) However, the Superior Court order cited by Kraft is a two-page order following an in-chambers, Rule 26(g) conference with the court. (*Id.* Attach. A.) The order simply states that the Assessor's request for the petitioner's filing position in other states is

10

denied without prejudice. *(Id.)* The order provides no explanation or context for the court's ruling and is, therefore, unpersuasive to this court. *(Id.)*

At oral argument, Kraft provided the court with an opinion from the Oregon Tax Court, *Oracle Corp. v. Dep't of Revenue*, 2010 Ore. Tax LEXIS 32 (Or. T.C. Feb. 11, 2010), in which the Oregon Department of Revenue argued that the Tax Court should fashion an equitable doctrine estopping a taxpayer from taking different positions regarding the same income in different states. *Id.* at \*6-7. The Oregon court noted many policy reasons for declining to adopt such a rule, namely that it would be unfair, unworkable, create illogical results, and would compromise the principals of federalism and another state's interest in maintaining its own tax laws and interpreting them in its own fashion. *Id.* at \*8-12. The Oregon court declared, "the question of whether an item of income is business or nonbusiness must be governed by Oregon law,..." *Id.* at \*10. Oregon Tax Court's opinion is persuasive. Like that case, the questions at issue here, whether the alternative apportionment method was appropriate and whether Kraft had substantial authority for its filing position, must governed by Maine law and decided based on the particular facts of this case. Thus, Kraft's income tax returns, combined reports, and related audits or assessments from other states are likely irrelevant.

However, this court is not being asked to decide the relevancy or admissibility of the requested income tax returns and related documents at this time. The court is being asked to decide whether the tax returns and related documents are simply discoverable. As discussed above, information is discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence." M.R. Civ. P. 26(b)(1). The Rules of Civil Procedure contemplate the disclosure of all matters potentially involved in the litigation, whether or not those matters relate to specific evidence that will be introduced at trial. 2 Harvey, *Maine Civil Practice* § 26:3 at

11

627-28. Although Kraft's income tax returns, combined reports, and any related audits or assessments may not be relevant or admissible, the tax returns and related documents may contain predicate facts and information regarding Kraft's business activities that may be relevant to the issues in this case and admissible at a later trial. Therefore, Kraft's income tax returns, combined reports, and any related audits or assessments from other states are discoverable.

However, the court agrees with Kraft that the Assessor's request for testimony from three of Kraft entities regarding all income tax returns, combined reports, and any related audits or assessments from other states without limitation for a three-year period is overbroad and unduly burdensome. Kraft represents that it conducts business in all fifty states. (Kraft Opp'n to Mot. Compel 1.) Thus, each deponent must be prepared to testify regarding 147 tax returns, combined reports, and any related audits or assessments. (*Id.* at 1-2.) Moreover, the fact that each state has its own statutes, regulations, case law, administrative interpretations, and policies that govern its tax laws would make providing accurate testimony even more unduly burdensome on Kraft. (*Id.* at 2.)

On a motion to compel discovery, the court may make such protective orders as justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense. M.R. Civ. P. 26(c), 37(a)(2). As discussed above, the Assessor's Notices specifically identified the income tax returns and combined reports for the states of California, Illinois, Kansas, Montana, and Wisconsin, and any audits or assessments by those states related to those returns. (Kraft Mot. Compel 5.) The Assessor has already conceded it is willing to limit its request to 2008 – 2010. (*Id.*) Therefore, the court shall compel Kraft to provide deposition testimony regarding only those five states for the period of 2008 – 2010. If the Assessor wishes to depose any Kraft entities regarding its income tax returns, combined reports, and any related

12

audits or assessment for states other than those five, the Assessor must make a motion with this court explaining why those tax returns are likely to lead to discoverable evidence.

B.   Item No. 25: Information about tax accrual work papers and other documents prepared by Kraft in connection with Kraft's 2009-2011 financial statements

In its motion, the Assessor clarifies that Item No. 25 of its Deposition Notices seeks testimony from the Kraft entities regarding "any tax accrual work papers and related documents in which Kraft disclosed internally (and to its independent auditors) its estimates of potential state income tax liabilities resulting from the $3 billion capital gain at issue here." (Kraft Mot. Compel 9.) The Assessor contends that these documents are prepared by Kraft as part of its obligations under federal securities law. (*Id.*) According to the Assessor, as part of its annual public financial statements, Kraft must calculate its reserves for contingent tax liabilities and have those reserves certified by an independent auditor. (*Id.*) The Assessor contends that Kraft objects to its request on the grounds that those requested documents are protected by the work-product doctrine. (*Id.*) The Assessor asserts that the First Circuit, in *United States v. Textron Inc.*, 577 F.3d 21 (1st Cir. 2009) (en banc), *cert. denied*, 560 U.S. 924 (2010), has ruled that these exact type of work papers and documents are not protected by the work-product doctrine. (*Id.* at 9-10.) The Assessor contends that the *Textron* is consistent with the work-product doctrine under Maine law. (*Id.* at 10.)

In support of its opposition, Kraft has provided an affidavit from its Director of State Income Taxes describing the requested documents. (*See* Lebiecki Aff.) According to Kraft, the requested documents consist of (1) memoranda prepared by the Chicago law firm Horwood, Marcus and Berk ("HMB"), at the request of Kraft's Senior Manager of State Income Taxes and Senior Director of State Taxes, analyzing the potential for and risks of litigation in Maine and other states associated with Kraft's position on the capital gain at issue in this case, and (2) a

13

spreadsheet prepared by Kraft's Senior Manager of State Income Taxes and Senior Director of State Taxes based on the memoranda, reflecting HMB's judgment regarding the chances of success in litigation and dollar amounts associated the position taken on the gain in each state. (*Id.* ¶ 5.) Kraft asserts HMB regularly represents Kraft with respect to tax issues, that the memoranda were shared only with Kraft's Senior Vice President of Taxes, and that the memoranda were not shared with anyone outside the company. (*Id.* ¶¶ 7-8, 10.) The spreadsheet was provided to Kraft's auditors to support its reserves for contingent tax liabilities. (*Id.* ¶ 9.) Kraft asserts that the memoranda are protected from disclosure by the attorney-client privilege, and that both the memoranda and the spreadsheet are protected by the work-product doctrine. (Kraft Opp'n to Mot. Compel 4, 6.) Kraft contends that the *Textron* case relied on by the Assessor is inconsistent with Maine law and that this court should adopt the approach of other federal and state courts regarding the work-product doctrine. (*Id.* at 7-9.) Kraft also asserts that the spreadsheet is irrelevant to remaining issues in this case. (*Id.* at 5-6.)

Foremost, a client has the privilege to refuse or prevent disclosure of any confidential communication between the attorney and client. M.R. Evid. 502(b). A communication is "confidential" if it is (1) made to facilitate the rendition of legal services to the client and (2) not intended to be disclosed to any third party other than those to whom the client revealed the information in the process of obtaining professional legal services. M.R. Evid. 502(a)(5); *see Fiber Materials, Inc. v. Subilia*, 2009 ME 71, ¶ 11 n.1, 974 A.2d 918. A person waives the privilege if he or she "voluntarily discloses or consents to the disclosure of any significant part of the privileged matter." Me. R. Evid. 510(a). The Law Court has stated, "a privilege is waived when a 'significant part' or 'key element' of the privileged communication has been disclosed by

14

the party claiming entitlement to the privilege." *Jensen v. S.D. Warren Co.*, 2009 ME 35, ¶ 31, 968 A.2d 528 (internal citation omitted).

According to the affidavit of Kraft's Director of State Income Taxes, the memoranda were confidential communications between a law firm and Kraft assessing the potential for and risk of litigation in Maine and other states that were not disclosed to anyone outside of Kraft. Therefore, the memoranda constitute a privileged communication between attorney and client. However, according to Kraft's affidavit, the spreadsheet was prepared "based on the HMB memoranda, reflecting HMB's judgment with respect to the chances of success in litigation..." and shared with Kraft's auditors. (Lebiecki Aff. ¶¶ 5, 9.) Therefore, based on Kraft's affidavit, a "key element" of the privileged communication has been disclosed by Kraft to a third party. Thus, attorney-client privilege has been waived.

Regarding the work-product doctrine, the First Circuit in *Textron* addressed whether the exact type of "tax accrual work papers" at issue in this motion were protected by work-product doctrine. *Textron*, 577 F.3d at 22-23. The majority stated that the work-product doctrine prevents disclosure of documents and other tangible things "'prepared in anticipation of litigation or for trial.'" *Id.* at 27 (quoting Fed. R. Civ. P. 26(b)(3)). It is not enough that the subject matter of a document might conceivably be litigated, the materials must be "prepared for" litigation or trial. *Id.* at 29. According to the majority, "Even if prepared by lawyers and reflecting legal thinking, materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity..." *Id.* at 30 (internal quotations, alterations, and citation omitted). Thus, "work product protection does not extend to documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the

15

litigation." *Id.* (internal quotation and citation omitted). The First Circuit held that, because the tax accrual work papers were independently required by statutory and audit requirements and were prepared to support financial filings and gain auditor approval, the tax accrual work papers were not "prepared for" litigation. *Id.* at 26, 31-32. Accordingly, tax accrual work papers were not protected by the work-product doctrine. *Id.* at 31-32.

In a dissenting opinion, Circuit Judge Torruella argues that the majority in *Textron* have applied the wrong test for the work-product doctrine. *Textron*, 577 F.3d at 32 (Torruella, J. dissenting). Judge Torruella contends that the majority's "prepared for" test is even narrower than the widely rejected "primary purpose test." *Id.* According to Judge Torruella, the appropriate test is "whether in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained **because of** the prospect of litigation." *Id.* (internal quotation and citation omitted) (emphasis in original). Judge Torruella states the "because of" test is not limited to documents "prepared for" use in litigation. *Id.* at 34. Quoting *United States v. Adlman*, 134 F.3d 1194 (2d Cir. 1998), Judge Torruella states:

> The [work-product doctrine, codified in Federal Rule 26(b)(3),] does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the Rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents "prepared... for trial" but also to those prepared "in anticipation of litigation." If the drafters of the Rule intended to limit its protection to documents made to assist in preparation for litigation, this would have been adequately conveyed by the phrase "prepared... for trial." The fact that documents prepared "in anticipation of litigation" were also included confirms that the drafters considered this to be a different, and broader category. Nothing in the Rule states or suggests that documents prepared "in anticipation of litigation" with the purpose of assisting in the making of a business decision do not fall within its scope.

*Id.* (quoting *Adlman*, 134 F.3d at 1198-99). Applying the "because of" test, Judge Torruella concludes that tax accrual work papers are protected by the work-product doctrine. *Id.* at 40.

16

According to Judge Torruella, the driving force behind the preparation of the tax accrual work papers was the need to reserve money in anticipation of litigation. *Id.* at 41. Although other business needs were also a motivating factor, those needs depended on anticipating litigation. *Id.* at 41. In other words, the dual purposes for creating the tax accrual work papers, anticipating litigation and gaining auditor approval for financial filings, were intertwined and the work-product doctrine should apply. *Id.*

Regarding the exception to the "because of" test that documents prepared in the ordinary course of business or that would have been created irrespective of litigation are not protected, Judge Torruella states that the exception does not strip away work-product protection for dual-purpose documents. *Id.* at 41-42. Rather, the exception should simply be read to distinguish business and regulatory purposes from litigation and to clarify that, although dual-purpose documents are protected, there is no work-product protection for but documents produced in the ordinal course of business "rather than" litigation. *Id.* at 42. Therefore, although the tax accrual work papers had a business and regulatory purpose, because the tax accrual work papers were prepared for the dual propose of anticipating litigation, they were not prepared irrespective of litigation and the exception does not apply. *Id.*

Under Maine law, a document is protected by the work-product doctrine, codified in Maine Rule of Civil Procedure 26(b)(3), "if it was created because of the party's subjective anticipation of future litigation." *Springfield Terminal Ry. Co. v. Dept. of Transp.*, 2000 ME 126, ¶ 16, 754 A.2d 353. "The preparer's anticipation of litigation must also be objectively reasonable." *Id.* (internal citation and quotation omitted). "Moreover, the document must also be of a type that can be considered work product. A party generally must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing

17

litigation." *Id.* ¶ 17 (internal citation and quotation omitted). The test is "whether, in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Id.* (internal citation and quotation omitted).

Our Law Court has also held that "a document prepared in the regular course of business may be prepared in anticipation of litigation when the party's business is to prepare for litigation." *Harriman v. Maddocks*, 518 A.2d 1027, 1034 (Me. 1986) (internal citation and quotation omitted); *see Springfield Terminal*, 2000 ME 126, ¶ 17 n.5, 754 A.2d 353 (stating *Harriman* remains good law). In *Harriman*, the plaintiffs sought to discover the entire claim file compiled by defendants' insurance adjuster. *Harriman*, 518 A.2d at 1031. The plaintiffs argued that evaluation of policyholder claims is the regular business of an insurance company and not done in anticipation of litigation. *Id.* at 1034. However, the Court held that, because one of the routine functions of a claims adjuster is to prepare for litigation, documents prepared by an insurance adjuster were protected by the work-product doctrine. *Id.*

Maine law is consistent with Judge Torruella's dissent. It is a routine function of a law firm to anticipate and prepare for litigation. The tax accrual work papers at issue in this motion contain a law firm's legal analysis regarding the potential risk of litigation associated with Kraft's tax position. Thus, it can be fairly said that the tax accrual work papers were prepared because of the prospect of litigation. The fact that tax accrual work papers also have a dual business and regulatory function does not negate fact they were prepared because of the need to anticipate litigation by a law firm whose business it is to prepare for litigation. The documents' business and regulatory function is intertwined with the need to anticipate litigation. Therefore, the tax accrual work papers are protected by the work-product doctrine.

18

Pursuant to Maine Rule of Civil Procedure 26(b)(3), a party may still discover documents protected by the work-product doctrine "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." M.R. Civ. P. 26(b)(3). The Assessor has made no such showing. Therefore, the court declines to compel Kraft to provide deposition testimony regarding the tax accrual work papers and related documents.

V.    CONCLUSIONS

The Kraft Respondents' motion to bifurcate is **DENIED**.

The State Tax Assessor's motion for an order compelling non-party Mondeléz International, Inc. to comply with a subpoena for the production of documents is **GRANTED**.

The State Tax Assessor's motion for an order compelling the Kraft Respondents to provide deposition testimony is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) The State Tax Assessor's motion to compel Kraft Respondents to provide deposition testimony regarding state income tax returns, combined reports, and any audits or assessments in others states is **GRANTED IN PART**. The Kraft Respondents shall provide deposition testimony regarding state income tax returns and combined reports filed by Kraft Foods and its affiliates for the states of California, Illinois, Kansas, Montana, and Wisconsin, and any audits or assessments by those states related to those returns for the period of 2008 – 2010. If the State Tax Assessor wishes to depose any Kraft Respondents regarding income tax returns and combined reports filed in any other states and any related audits or assessments, the State Tax Assessor must make a motion with this court explaining why those tax returns are likely to lead to discoverable evidence.

19

(2) The State Assessor's motion to compel Kraft Respondents to provide deposition testimony regarding tax accrual work papers and related documents is **DENIED**.

Pursuant to Maine Rule Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated  6 / 7 / 12

_M. Michaela Murphy_
**M. Michaela Murphy**
**Justice, Business and Consumer Court**

Entered on the Docket: 6/7/17
Copies sent via Mail___Electronically ✓

20

**State Tax Assessor v. Kraft Foods Group, Inc., et al.**

**BCD-AP-16-02**

#### Plaintiff

**State Tax Assessor**

Thomas Knowlan, AAG.
6 State House Station
Augusta, ME 04333

#### Defendant

**Kraft Foods Group, Inc.**
**Kraft Foods Global, Inc**
**Kraft Pizza Company**
**Cadbury Adams USA, LLC**

Jonathan A. Block, Esq.
254 Commercial St.
Portland, ME 04101